RECEIVED

MAR 3 0 2006

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
          DEPUTY CLERK

FILED

MAR 3 0 2006

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
          DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| **Iron Thunderhorse #624-391**<br>**Leroy Anthony Baca #448-621**<br>**Robert Allen Hicks # 1115-832**<br>**Carl Albert Marley #180-463**<br>**Polunsky Unit**<br>**3872 FM 350 South**<br>**Livingston, Texas  77351** | **Case No. A 05CA1009SS** |
| | **Hon. Samuel Sparks** |
| **Timothy Jost #1059-796**<br>**Allred Unit**<br>**2101 F.M 369 North**<br>**Iowa Park, Texas  76367** | |
| **Larry Gatlin # 691-995**<br>**Dustin T. Burk #816-309**<br>**Ruben Miguel Buckner #1093-899**<br>**Beto Unit**<br>**Post Office Box 128**<br>**Tennesee Colony, Texas  75880** | **AMENDED COMPLAINT**<br><br>**With Jury Demand**<br>**Endorsed Hereon** |
| **Michael G. Dearth  #840-551**<br>**Erick F. Duarte, Jr. #577-074**<br>**Wilbur B. Honeycutt #1016-046**<br>**Timothy B. Gilliam #1175-788**<br>**Boyd Unit**<br>**Route 2, Box 500**<br>**Teaque, Texas   75860** | |
| **Billy George Williams #840-708**<br>**Albert W. Richardson #928-977**<br>**Frank D. Carter #561-942**<br>**Wayne L. Cox #572-020** | |

Paul A. Schumacher  #930-813
Jesse Dickson #231-673
Clements Unit
9601 Spur 591
Amarillo, Texas  79107-9606

David W. McWherter #267-382
Connally Unit
899 FM 632
Kenedy, Texas  78119

Guadalupe Padilla  #1088-118
James Ray Clayton #485-325
Dalhart Unit
11950 FM 998
Dalhart, Texas  79022

William M. Wirtz, M.B.A. #793-536
Anthony LaBrec #862-003
Wendel Center #620-909
Kenneth Wayne Herndon #291-481
Daniel Unit
938 South FM 1673
Snyder, Texas  79549

Dr. Travis Smith #684-080
Eastham Unit
Post Office Box 16
Lovelady, Texas 75851

Daniel Hudman #343-386
Raymond Gross #802-092
Ellis Unit
1697 FM 980
Huntsville, Texas  77343

Peggy Keener #641-816
Gatesville Unit
1401 State School Road
Gatesville, Texas  76599-2999

David Salinas #766-872
Bryan Eric Page #1061-602
Leo E. Fennessey #388-299
Alfred Gonzales #679-721
Philip Brasfield  #320-515

Michael Boone # 915-679
Tim Nixon #584-119
Earl David Bryant #452-050
Jimmy Wayne Matheson #592-463
Hughes Unit
Route 2, Box 4400
Gatesville, Texas  76597

Eddie Fairless #588-716
Gary D. Elliott #476-421
Russell Stevens #582-587
James W. Dickerson #936-542
Christopher J. Hightower #1026-081
Lucius J. Wooton #1031-573
Florent Luc Litalien #753-225
Huntsville Unit
815 12th Street.
Huntsville, Texas  77348

Jon N. Phillips #736-477
Ruben Gomez Ortiz #317-146
Anthony D. Bridges #679-785
Luther Unit
1800 Luther Drive
Navasota, Texas  77869

Glenn D. Schackelford #780-968
Donald Wayne Stevens #798-031
Charles E. Lumsdon # 1193-014
Lynaugh Unit
1098 South Highway 2037
Fort Stockton, Texas  79735

Archie Tobias #583-391
Lynn Creel #370-560
McConnell Unit
3001 South Emily Drive
Beeville, Texas  78102

Jamison C. Choromokos #407-119
Earl Joseph Owens #644-656
Willie Frank Baltzgar #410-372
Larry Williams #870-676
Howard D. Nielsen #1106-503
John Alton Burtchell #536-692
Crispin Cortez #637-479

Michael Unit
Post Office Box 4500
Tennessee Colony, Texas  75886

Barry L. Brashear #1123-131
Mineral Wells Unit PPT
759 Heintzelman
Corrections Corp. of America
Minerals Wells, Texas  76067

Kathy Haskins  #846-412
Angelica Marie Martinez  #578-678
Sherri Wilkens  #544-409
Mountain View Unit
2305 Ransom Road
Gatesville, Texas  76528

Ann Whitlow Clark, Esq.  #1150-868
Hobby Unit
742 F.M. 712
Marlin, Texas  76661

Mickie Kellis #763-881
Katherine Miles #514-549
Tammie Hudson  #670-849
Lane Murray Unit
1916 North Highway, 36 Bypass
Gatesville, Texas  76596

Enrique R. Tovar #1160-961
Neal Unit
9055 Spur 591
Amarillo, Texas  79107-9696

Mark Mullins #748-975
Pack Unit
2400 Wallace Pack Road
Navasota, Texas  77869

Leroy Anthony Baca #448-621
Iron Thunderhorse #624-391
Robert Allen Hicks # 1115-832
Carl Albert Marley #180-463
Polunsky Unit
3872 FM 350 South
Livingston, Texas  77351

James D. Creel #232-292
John Byron Yarbrough #688-355
Ivan Torres #491-610
Ramsey I Unit
1100 FM 655
Rosharon, Texas  77583

Jolando King #1156-477
Ellis D. Burrell #336-498
Natividad Rodriguez #506-920
Ramsey II Unit
1200 FM 655
Rosharon, Texas  77583

Jack Thompson #263-627
Thomas L. Cole # 448-407
Jerry H. Broseh #438-382
Robertson Unit
12071 FM 3522
Abilene, Texas  79601

William H. Davis #731-707
James R. Harris #297-342
Larry Michael Francis #1118-261
Stiles Unit
3060 FM 3514
Beaumont, Texas  77705-7635

Dustin Bonomo # 1106-202
Wallace
1675 South FM 3525
Colorado City, Texas  79512

The Estate of David Ruiz

Kimberly Leavelle
14311 Sky Frost, Lot 313
Dallas, TX  75253

Mark White
2316  Woodcrest Dr.
Smyrna, GA.  30082

Kenneth Bone
2495 Gulf St.
Beaumont, TX  77703

John Longoria # 716-767
11201 Olympia Dr. Apt. 3204
Houston, TX  77042-2750

Jeanine Drager
6441 Carthage St.
San Diego, CA  92120

Lincoln Mitchell Angelle
124 Cabaniss
Baytown, TX  77520

### Plaintiffs

vs.

Rissi L. Owens,
Jose Aliseda, Jr.,
Charles Aycock,
Jackie DeNoyelles,
Linda Garcia,
Juanita M. Gonzalez,
Elvis Hightower,
Solely in their official capacities
as members of the Texas
Board of Pardons and Paroles
Texas Board of Pardons and Paroles
P.O. Box 13401, Capital Station
Austin, Texas  78711

### - and -

Gerald Garrett,
Thomas G. Fordyce,
Pamela D. Freeman,
James Paul Kiel, Jr.,
James C. Poland,
Lynn Ruzicka,
Alvin A. Shaw,
Charles Shipman,
Charles C. Speier,
Howard A. Thrasher, Sr.,
Solely in their official capacities

as Parole Commissioners,
Texas Board of Pardons and Paroles
P.O. Box 13401, Capital Station
Austin, Texas  78711

- and -

Christina Melton Crain,
Solely in her official capacity
as Chair of the
Texas Board of Criminal Justice,
209 West 14th Street – 5th Floor
Austin, Texas  78701

- and -

Brad Livingston,
Solely in his official capacity
as Executive Director of the
Texas Department of Criminal Justice
209 West 14th Street – 5th Floor
Austin, Texas 78701

- and -

Doug Dretke,
Solely in his official capacity
as Director of the Correctional
Institutions Division
Texas Department of Criminal Justice
209 West 14th Street – 5th Floor
Austin, Texas  78701

- and -

Gary Gomez,
Solely in his official capacity
as Deputy Director, in charge of
Support Services
Correctional Institutions Division

Texas Department of Criminal Justice
209 West 14th Street – 5th Floor
Austin, Texas  78701

- and -

Pamela Williams,
Solely in her official capacity as
Assistant Director for Classification and
Records, Support Services, for the
Correctional Institutions Division
Texas Department of Criminal Justice
209 West 14th Street – 5th Floor
Austin, Texas  78701

Defendants

# Class Action Complaint
(Fed. R. Civ. P. 23)

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, and on behalf of themselves and the classes alleged in this complaint, Plaintiffs state the following complaint against Defendants:

# Preliminary Statement

1. Plaintiffs in this class action lawsuit are currently incarcerated Texas offenders and formerly incarcerated Texas offenders subject to the supervision of the Texas Department of Criminal Justice under either parole conditions or terms for probation. Plaintiffs are also subject to the jurisdiction of the Board of Pardons and Paroles.

2. Texas leads the States in the number of inmates incarcerated, even though California has about 10 million more residents. For 2003, the U.S. Bureau of Justice Statistics, a division of the U.S. Department of Justice, reported 164,222 inmates incarcerated in Texas,[1] while California reported 162,515 inmates. While the number of inmates in Texas and California is close, the average per 100,000 residents is not close at all. Texas, with 692 inmates for every 100,000 residents, has the highest ratio of inmates to population in the country. California's ratio of 455 inmates per 100,000 residents is below the national average of 480 inmates per 100,000 people.

3. Texas also has a legacy of exceptionally long prison sentences followed by exceptionally long periods of supervision under parole or probation. As a result, an estimated one out of 20 residents are subject to some form of custody or supervision imposed by these Defendants.[2] To put it another way, the Bureau of Justice Statistics estimates that one quarter of the nation's parole and probationers live in Texas.

---

[1] The Texas Department of Criminal Justice disputes the figure of 164,222, and claims only 148,000 inmates. The lower figure does not count convicted inmates serving their sentence in a local jail. The Justice Department count includes these inmates.

[2] As of year end 1999, there were 706,600 Texans either in prison, jail, on parole or probation. In a state with 14 million adults, this averages out to roughly 5% of the resident population. [Source : Justice Policy Institute analysis of data from Texas Department of Criminal Justice, Sourcebook of Criminal Justice Statistics 1998 (1999), Washington, D.C. U.S. Department of Justice, Bureau of Justice Statistics, State Population Estimates: Annual Time Series (July 1, '90 to July 1, '99). *See also* Center on Juvenile and Criminal Justice, Texas Tough, An Analysis of Incarceration and Crime Trends in the Lone Star State, [Oct. 2000 release.]

4. With over 700,000 Texans either in prison or subject to supervision, the Texas Board of Pardons and Paroles, a/k/a the Parole Board, wields authority over more people than Governors in three States and by the District of Columbia's Mayor.[3] Because the present and future freedom of these current and former inmates hangs in the balance, decisions made by these Defendants invariably involve life altering experiences. Beyond the 700,000 plus offenders directly affected, an unknown number of spouses, dependent children, parents and siblings live in fear and dread of the authority exercised by these Defendants, as the fates of inmate families are also affected by the decisions of these administrators.

5. Prisons in Texas are a big business. Inmate labor is used to make socks, draperies, boots, mattresses, t-shirts, braille books, refurbish computers, electronic pc circuit boards, refurbishing horse trailers, making harnesses for flatbed truck trailers and numerous other businesses. Inmate labor is used to pick cotton, sweet potatoes, corn, carrots, peppers, radishes and numerous other crops. The Texas prison system owns and operates livestock farms, and one unit includes a meat packing plant producing boxed beef.

6. Prisons have also become vital employers and revenue generators for small communities. Families in small communities have become dependent

---

[3] These states include Alaska (619,500), Vermont (593,740), Washington, D.C. (519,000) and Wyoming (479,600). All figures reflect 1998 census estimates.

upon prisons for jobs. Surrounding businesses rely upon orders placed by a prison purchasing department and upon the spending of disposable income by prison employees at local groceries and restaurants.

7. Though already the largest prison system among States and rapidly approaching the number of incarcerated inmates held by the Federal Government, the Texas Department of Criminal Justice continues to grow and expand, filling its state institutions and increasingly leasing space from county prisons. While violent crime in the 1990's reflected a decline, the Texas prison system maintained its steady, cancer-like expansion throughout the decade.

8. This fixation upon continual expansion of the Texas prison system has been driven not by crime, but by economic and business considerations. Prisons are a lucrative business. If every bed is filled, all economies of scale are being realized and profit is being maximized. This hotel mentality has gripped the Texas Department of Criminal Justice with a vengeance.

9. On November 7, 1989, Texas voters approved an amendment to the Texas Constitution which authorized combining all state agencies dealing with criminal justice.[4] In accordance with this constitutional amendment, Texas parole, probation and correction agencies were all rolled into one giant agency, the Texas Department of Criminal Justice. The staff of the Pardons and Parole

---

[4] *See* Texas Constitution, Article 4, § 11B. *See also* 71st Legislature, Criminal Justice Reform Act, HJR 101, Approved by Texas voters on November 7, 1989.

Division (i.e. the Parole Board) was placed under the newly created Texas Department of Criminal Justice, but the Board of Pardons and Paroles, without its staff, remained autonomous and separate. Though initially this Board of Pardons and Paroles was expanded from 6 to 18 members, it has presently been trimmed back to 7 members, while its staff resources remain skeletal.

10. By 1993, this reorganization was complete and in force. With the creation of this new giant department, the business agenda of the prison industry could move forward without any obstacles in its path. Fueled by lobbyists, consultants and prisons for profit advocates, their mantra that prisons were good for the economy because they create jobs became a self fulfilling prophesy, producing a continually expanding self-perpetuating prison industrial empire. Creating these jobs and maximizing these financial returns has been achieved, but the fabric of Texas society, particularly among citizens lacking the means to afford private attorneys for criminal law defenses, has paid a brutal price. Mercy and compassion have been sacrificed at the altar for unrelenting punishment, monetary gain and the exercise of absolute authority.

11. At the same time, a very basic and fundamental shift occurred in the Parole Board's mission. The Parole Board's function became subordinated to the business agenda of the Texas Department of Criminal Justice. By law, the Parole Board is charged with the responsibility of giving individualized

12

attention to parole candidates. Lacking staff and resources, this individualized attention was rendered impossible. In its place, the Parole Board became a tool for controlling ebbs and flows in the inmate population by blocking its exits. The granting of a parole was subjected to a condition totally set apart and beyond the power of an individual parole candidate to influence. The number of paroles granted had to be balanced with the number of new entrants, to be sure that all beds in the prison system remained fully utilized.

12. The Federal constitutional violations and the state claims described herein are an inevitable and easily foreseeable result of the evils accompanying the subordination of the Parole Board's mission to the business agenda of the Texas Department of Criminal Justice. Plaintiffs further submit that these Defendants are wrecking enormous havoc and long term harm upon the administration of Criminal Justice in Texas.

## Jurisdiction and Venue

13. Jurisdiction is conferred upon this court by 28 U.S.C. § 1331 which authorizes federal courts to decide cases concerning federal questions, and by 28 U.S.C. § 1343(a) which authorizes federal courts to hear actions brought under 42 U.S.C. § 1983 [hereafter *§ 1983*]. §1983 affords a basis for any citizen to present a cognizable claim for relief against state actors if, as a result of state action, these citizens have been deprived of any rights, privileges, or

immunities secured by the U.S. Constitution and / or by U.S. laws.

14. Jurisdiction is further conferred by 28 U.S.C. § 1332, the diversity statute. Pursuant to the Class Action Fairness Act of 2005 (hereafter the *Fairness Act*), signed into law by President Bush on February 18, 2005 [S. 5ES, 109th Cong., 1st Session], diversity jurisdiction for class actions has been expanded. Under this Fairness Act, diversity jurisdiction is satisfied if any one member of the class, named or not named, has diverse citizenship from any one Defendant.[5] Among the Named Plaintiffs, one former Texas inmate under supervision currently resides in San Diego, California. Plaintiffs further represent that this is but the first of many former offenders and class members on parole or probation currently residing outside of Texas.

15. The Fairness Act drops the requirement of alleging $75,000 in losses by individual class members and further allows for claims of class members to be aggregated, requiring only that these claims exceed $5 million. Plaintiffs' Separation of Powers claim seeks compensation for unlawful incarceration. The Texas Code authorizes a payment of $25,000 per year for every person wrongfully incarcerated.[6] Plaintiffs' Bad Faith claim alleges an improper economic motive, namely the goal of maintaining full prisons to maximize profits, behind Plaintiffs' illegal detention. Plaintiffs submit that

---

[5] *See* 28 U.S.C. § 1332 (d)(2).
[6] V.T.C.A., Civil Practice and Remedies, § 103.001 et seq.

14

aggregated damages rendered by Defendants can easily exceed the sum of $5 million and can potentially run into hundreds of millions of dollars.

16. Plaintiffs do not initially seek their release from incarceration and supervision. Instead, they seek the injunctive and declaratory relief available through § 1983 exclusively.

17. Plaintiffs maintain that these Defendants have violated the liberty interest and the Due Process rights of inmates denied their mandatory supervision date. Plaintiffs further maintain that these Defendants are performing the function of judges and, in the process, judicial sentences are being overruled and superseded or materially amended, precipitating a violation of the Separation of Powers Doctrine pursuant to §1983.

18. While the declaratory relief provided by §1983 enables an inmate to establish the violation of a liberty interest and / or the existence of an *ultra vires* parole board sentence, only the habeas corpus statute affords suitable relief from unlawful incarceration. Conversely, while habeas corpus affords relief from unlawful incarceration, it is not designed and equipped to establish the factual predicate – namely a declaratory judgment stating administrators violated the Due Process clause and / or that these administrators acted *ultra vires* and performed the function of judges – necessary for engaging its restricted remedy. Under these facts, the remedy afforded by §1983 – a finding

15

that these Defendants violated the liberty interest of inmates and / or are usurping the authority of judges – and the remedy of release from prison afforded by habeas corpus become constituent ingredients embedded in the same case or controversy for Article III purposes.

19. In general, if an inmate is challenging the fact or duration of their confinement, their sole remedy is habeas corpus. As with any general rule, there are exceptions. When the remedy of §1983 and the remedy of habeas corpus are indigenous to the same case or controversy for Article III purposes, an exception to the general rule is justified by the need to forge a remedy adequate to address and correct the violation. Under the particular facts of this case, only a merging of both statutes achieves this objective.

20. Subject to and dependent upon a ruling in Plaintiffs' favor upon their Due Process claim for denial of mandatory supervision and / or their Separation of Powers claim for usurping the authority of a trial court judge by altering, negating or modifying terms of their prison sentences, the principles of pendant jurisdiction are engaged for combining remedies through § 1983 with remedies through habeas corpus.

21. Contingent upon a finding in Plaintiffs' favor that Defendants have violated the Due Process rights of inmates and / or are usurping the authority of judges, the invoking of Plaintiffs' habeas corpus claims arise from the

execution of a sentence and not from the imposition of a sentence, thereby engaging 28 U.S.C. § 2241 primarily and 28 U.S.C. § 2254 only tangentially. The latter section is applicable because Plaintiffs are state prisoners and must satisfy the procedural requirements of this section.

22. The principles of pendant jurisdiction are further engaged to accommodate Plaintiffs' claim for Bad Faith. No federal question can be raised by a claim for Bad Faith. However, once a predicate injury in the form of a constitutional violation has been validated, this Court's pendant jurisdiction permits consideration of a claim for Bad Faith and its concomitant remedy for monetary damages. Plaintiffs' request for monetary damages springs exclusively from its Bad Faith claim.

23. In accordance with the recent case of Wilkinson v. Dotson,[7] challenges to parole procedures, including challenges to parole eligibility and challenges to parole suitability, may be brought pursuant to § 1983.

24. Venue is proper in this Court because these Defendants are Texas residents, as well as officers and employees of Texas, acting in their official capacities and under color of state authority. The business of these Defendants is conducted throughout the state of Texas, including the Western District. Furthermore, many proposed class members are held in custody in the Western

---

[7] 544 U.S. ___, 125 S. Ct. 1242 (2005).

District of Texas. Thus, their claims arise in the Western District as well.

Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) (1).

**Applicable Federal Laws**

25. Under the Fairness Act, this Court's jurisdiction is no longer limited

to questions suitable for consideration under §1983. Once diversity jurisdiction

has been engaged, this Court becomes vested with authority to entertain all

claims predicated upon state law, as well as all claims arising under §1983.

26. The Prison Litigation Reform Act, 42 U.S.C. § 1997 (e)(a) stipulates

that no action shall be brought with respect to prison conditions under § 1983

until available administrative remedies are exhausted.  For a § 1983 civil rights

grievance, inmates can file a grievance with the Grievance Commissioner in

the Texas Department of Criminal Justice. A Step 1 Grievance is filed at the

Unit or prison level. A Step 2 Grievance is filed with the Central Office.

Exhaustion of administrative remedies involves the filing of a Step 1 and Step

2 grievance. However, if an inmate tenders a grievance complaining about any

matter relating to their parole review, they receive a note back stating that

parole is not a grievable issue. Accordingly, the exhaustion requirement of the

Prison Litigation Reform Act has been waived, as there are no administrative

remedies to exhaust for issues concerning parole or mandatory supervision.[8]

## Parties

27. Plaintiffs are offenders who have been convicted of felonies and incarcerated in Texas. The names, institution numbers and residences of our current Named Plaintiffs are listed above and incorporated by reference as if each name, number and address is printed here. We anticipate continually adding new class members until they number eventually into the thousands.

28. The criminal activity of the named and not named plaintiffs runs the entire ambit of deviant human behavior. The bulk of these crimes involve situational circumstances that will never be repeated. There are some truly horrific crimes, as well as some Named Plaintiffs that steadfastly maintain their innocence. Many inmates were in their teens when these crimes were committed. Today, in middle age, these offenders have secured college degrees, vocational training and transformed themselves into model prisoners.

29. The crimes of Named Plaintiffs date back to the 65th Legislature and earlier. Due to changes in parole eligibility requirements enacted by later legislatures, class members are subject to a bewildering array of parole rules.

30. Named Plaintiff Jesse Dickson will have been incarcerated nine years when his current set-off expires for a technical parole violation. Named

---

[8] *See* V.T.C.A., Government Code § 508.149 (d). [No administrative or judicial appeals for denial of Discretionary Mandatory Supervision].

Plaintiff John Longoria is a former inmate free on parole. These Named Plaintiffs and others represent a second class of Texas inmates that have been granted parole. The issues relating to these class members involve conditions relating to their supervision, to the revocation of their parole and to terms of incarceration required for a technical parole violation.

31. Defendants  Rissi L. Owens, Jose Aliseda, Jr., Charles Aycock, Jackie DeNoyelles, Linda Garcia, Juanita M. Gonzalez and Elvis Hightower are members of the Texas Board of Pardons and Paroles, hereafter the Parole Board, and are being sued solely in their Official Capacities as Parole Board Members. Under Texas law, the Parole Board is an independent agency charged with the authority to make decisions regarding the granting and revoking of paroles and the terms and conditions for release from prison.

32. Each Parole Board Member has two assistants. The Parole Board has no central staff. Its members operate out of several regional offices. An institutional parole officer is located at every prison to do interviews. This skeletal and dispersed staffing arrangement constitutes the full compliment of personnel allocated to the Parole Board for performing its duties.

33. The official duties of the Parole Board include adopting policies relating to parole decision-making, providing information of public interest, doing an annual report of fiscal activity, developing training programs,

developing a handbook for hearing participants, adopting rules relative to release decisions, adopting a mission statement, adopting rules relative to the submission of information relating to parole candidates, adopting a policy to consider inmates previously denied, interviewing victims, signing subpoenas and promulgating policy on recusal from cases, and voting on all cases requiring an extraordinary vote.

34. Defendants Gerald Garrett, Thomas G. Fordyce,  Pamela D. Freeman, James Paul Kiel, Jr., James C. Poland, Lynn Ruzicka,  Alvin A. Shaw, Charles Shipman, Charles C. Speier and Howard A. Thrasher, Sr. are Parole Commissioners and are also being sued solely in their Official Capacities. The official duties of Parole Commissioners also involve interviewing inmates and issuing subpoenas.

35. Along with these duties, Parole Board Members and Parole Commissioners [hereafter referred to collectively as "Parole Board Defendants" or simply as the "Parole Board"] must conduct a preliminary screening of the entire inmate population to ascertain which offenders are entitled to either mandatory supervision or parole consideration. This exercise involves retrieving and reviewing over 164,000 files. Throughout this screening process, these decision-makers must pull files qualifying for further consideration.

36. After sifting through these 164,000 files, Parole Board Members and Parole Commissioners will discover an estimated 78,000 inmates entitled to either parole consideration or eligible for mandatory supervision.[9] To be approved for parole or mandatory supervision, each candidate is entitled to a panel of three voting members. Collectively, these 17 parole decision-makers will cast 234,000 votes [i.e. 78,000 cases times three].[10] In addition, Parole Board Members must decide all clemency hearings. A significant percentage of the 29,000 sex offenders held in Texas are entitled to a full Board hearing, which means 7 votes must be cast. This idiosyncrasy of Texas law is not included in these 234,000 votes to be cast.

37. In addition to conducting a preliminary search through 164,000 files to discover and then consider 78,000 parole and mandatory release cases, these 17 decision-makers must also determine conditions for parole and mandatory supervision, modify and withdraw conditions, and make revocation of parole decisions for inmates currently under supervision.

38. Defendant Christina Melton Crain is Chairman of the Texas Board

---

[9] The figure of 78,000 is quoted in Appropriation Bills for Years Ending August 31, 2004 and August 31, 2005, Texas Department of Criminal Justice, at page V-12.

[10] To place this in perspective, Ohio has 9 Parole Board Members, 2 Chief Hearing Officers and 21 Hearing Officers for a total 33 parole decision-makers to decide 3,332 regular parole hearings during Ohio's fiscal 2005 year. Furthermore, only two voting members are required for a panel in Ohio, which translates into 6,664 votes to be cast. In comparison, the Texas Parole Board has half the number of parole decision-makers for deciding more than 23 times the number of parole cases and casting 35 times the number of votes for candidates.

of Criminal Justice, and she is being sued only in her official capacity. Ms. Crain has authority to promulgate policies, rules and regulations governing both the Texas Department of Criminal Justice and the Board of Pardons and Paroles (i.e. the Parole Board). Through her duties, Ms. Crain is conducting business throughout the state, including the Western District. Although Ms. Crain is the only person with the Texas Board of Criminal Justice being named, through her position as Chair, we are further joining the Texas Board of Criminal Justice in its entirety and specifically all executives, agents and administrators, as well as any consultants, if through their duties, they may have any role whatsoever in any of the matters set forth in this complaint.

39. Defendant Brad Livingston is Executive Director of the Texas Department of Criminal Justice, a/k/a *T.D.C.J.*, and he is being sued only in his official capacity. Mr. Livingston has authority to promulgate policies, rules and regulations governing both the Texas Department of Criminal Justice and the Board of Pardons and Paroles (i.e. the Parole Board). Through his duties, Mr. Livingston is conducting business throughout the state, including the Western District. Although Mr. Livingston is the only person with the Texas Department of Criminal Justice named, through his position as Executive Director, we are further joining the Texas Department of Criminal Justice in its entirety and specifically all executives, agents and administrators, as well as

any consultants, if through their duties, they may have any role whatsoever in any of the matters set forth in this complaint.

40. Defendant Doug Dretke is being sued only in his official capacity as Director of the Correctional Institutions Division. This department was created in 2003, and represents a merger of the Institutional Division, Operations Division, Private Facilities Division and the State Jail Division. Mr. Dretke is responsible for the operation of Support Services, headed by Defendant Gomez, which includes Classification and Records. Through Mr. Dretke and his position as Director of the Correctional Institutions Division, we are further joining all executives, agents and administrators, as well as any consultants, if through their duties, they may have any role whatsoever in any of the matters set forth in this complaint

41. Defendant Gary Gomez is being sued only in his official capacity as Deputy Director for Support Services for the Correctional Institutions Division. Mr. Gomez is responsible for supervising the operation of Classification and Records. Through Mr. Gomez, we are further joining any agents, administrators as well as any consultants, if through their duties, they may have any role whatsoever in any of the matters set forth in this complaint.

42. Defendant Pamela Williams is being sued only in her official capacity as Assistant Director for Classification and Records. Ms. Williams

24

reports directly to Defendant Gomez, Deputy Director for Support Services in the Correctional Institutions Division. Classification and Records schedules, receives, and processes offenders for intake, release, and transfers from the various units (i.e. prisons) operated by the Correctional Institutions Division. Classification and Records creates and maintains records on these offenders and serves as the principal repository for offender records for T.D.C.J. The Classification and Records Department uses a centralized offender record system to systematically group offenders. Classification and records provides technical support for all unit-based classification personnel.

43. Defendants Christina Melton Crain, Brad Livingston, Doug Dretke, Gary Gomez and Pamela Williams shall also be known and referred to collectively as the "T.D.C.J. Defendants" or as simply "T.D.C.J."

44. Further, Classification and Records [hereafter referred to as *Classification*] has the manpower and computer support resources necessary to monitor individual inmates and make judgments on a specific inmate's case.

## Class Action Allegations

45. Two classes are proposed. A common denominator is applicable to both classes. Members of both classes are subject to the discretion of the Texas Parole Board. Plaintiffs request that each class shall have two subclasses.

46. The definition of Class One is:

All Texas inmates presently incarcerated for an indeterminate sentence which necessarily requires the granting of a parole if an inmate is to be released prior to serving the maximum expiration date of this sentence.

47. Under this broad class, we request the creation of two subclasses.

(1) The first subclass, termed the *active class*, shall consist of all Texas inmates that have financially supported the maintenance of this litigation through payment of a moderate legal fee (i.e. $400). Counsel for the class will maintain this list of active class members and keep opposing counsel abreast of new additions periodically or as requested.

(2) The second subclass, termed the *dormant class*, shall consist of all incarcerated Texas inmates that cannot financially support the maintenance of this litigation. All remaining Texas inmates shall fall in this class by default.

48. The definition of Class Two is:

All paroled Texas inmates currently subject to the supervision of these Defendants whose right to remain in free society is subject to their discretion, plus all incarcerated Texas inmates serving time for technical violations of their supervision agreement occurring while on parole or probation, whose release necessarily requires the granting of a new parole if an inmate is to be released prior to serving the maximum expiration date of their sentence.

Under this broad class, we request the creation of two subclasses.

(1) The first subclass, termed the *active class*, shall consist of all Texas inmates that have financially supported the maintenance of this litigation. Counsel for the class will maintain this list of active class members and keep opposing counsel abreast of new additions periodically or as requested.

(2) The second subclass, termed the *dormant class*, shall consist of all former Texas inmates that cannot financially support the maintenance of this litigation. All remaining Texas inmates shall fall into this class by default.

49. These two classes are not mutually exclusive. There will be Named Plaintiffs with multiple set-offs for no other reason than nature of the offense, qualifying them for a Due Process violation and placing them in Class One. These same offenders may be technical parole violators, qualifying them for inclusion in Class Two.

**Rule 23 Allegations**

50. The above named Plaintiffs bring this action in their own behalf and for the classes defined herein pursuant to Rule 23 of the Federal Rules of Civil Procedure. New Named Plaintiffs will be continually added to these existing Named Plaintiffs. This Complaint will not be amended solely for the purpose of adding new class members. Instead, all such future additions of Named Plaintiffs are hereby incorporated by reference as if fully printed here.

51. Both classes are so numerous, joinder of all members is impracticable. In addition, these proposed classes are fluid, in that inmates are leaving Class one and joining members in Class Two. Members of Class Two are being violated and returning to prison, where they can join members of Class one. As such, these classes are both numerous and fluid.

52. Plaintiffs are alleging a common course of conduct maintained by

these Defendants which is subject to common proof. As a result, there are questions of law and fact common to both classes.

53. The Named Plaintiffs will fairly and adequately protect the interests of both classes. The interests of the class of Named Plaintiffs are consistent with those of the class members. Plaintiffs' counsel knows of no conflicts of interest among class members that would affect litigation between the attorney and class members.

54. The claims of Named Plaintiffs are typical of claims for class members. Named Plaintiffs seek the same remedies as class members; (1) injunctive relief and declaratory judgment relief pursuant to §1983.

55. Subject to and dependent upon a ruling in Plaintiffs' favor upon its Separation of Powers claim under §1983, Named Plaintiffs further seek the remedy engaged by the habeas corpus statute for those Named Plaintiffs whose facts constitute an unlawful prison sentence created by *ultra vires* acts of Defendants, resulting in a violation of the Separation of Powers Doctrine.

56. Subject to and dependent upon a ruling in Plaintiffs' favor upon any constitutional claim, these Named Plaintiffs further seek the remedy of monetary damages for their Bad Faith claim.

57. Use of the class action mechanism is superior to other available methods for the fair and efficient adjudication of claims and will prevent the

imposition of undue financial, administrative and procedural burdens on the parties and the Court that individual litigation of these claims would impose.

### Common Practice Allegations

58. Plaintiffs are inextricably intertwined with Defendants. In the case of Class 1 Plaintiffs held in custody, Defendants literally control the schedule of these class members 24 hours a day, seven days a week. In the case of Class 2 Plaintiffs, Defendants enforce the terms of a supervision agreement placing a number of restrictions upon the freedom of class members. The relationship between Class 1 and Class 2 members and Defendants is also for a long term.

59. The relationship existing between Plaintiffs and Defendants is governed by rules, enforced by a complex mixture of privileges which can be granted as well as withheld and disciplinary measures which can be imposed for violating these rules. This milieu of rules, privileges and disciplinary options are collectively referenced herein as *institutional regulations*. In the case of Class 1 Plaintiffs held in custody, these *institutional regulations* define the life style of class members down to such minute details as the size of a container available for holding personal items. The cohesion created by these *institutional regulations* is deliberately calculated to create a strong bond of reliance and dependency upon Defendants by Plaintiffs.

60. A different set of rules, governed by a mixture of privileges and

disciplinary options governs Class 2 members. This milieu of rules, privileges and disciplinary sanctions are collectively referenced herein as *supervisory regulations*. For example, before a Texas inmate on supervision can move to a new location, their new residence must be inspected in advance and approved. If these rules are violated, there are consequences and sanctions, including a return to prison. While *supervisory regulations* exercised over Class 2 class members are not as stringent as *institutional regulations* imposed upon Class 1 members, there is nevertheless a palpable cohesion created which is also deliberately calculated to foster reliance and dependency upon Defendants by Class 2 members for all subjects governed by parole and probation conditions.

61. As a result of these *institutional* and *supervisory regulations*, a very strong nexus exists between Defendants and Class 1 and Class 2 members. This nexus is further characterized by a strong reliance and dependency upon these Defendants by Plaintiffs.

## Allegations Common to all Claims

62. Texas has defined its penological interests by requiring an offender to serve an indeterminate sentence, as opposed to a determinate fixed sentence. In an indeterminate sentencing scheme, there are two sentences. One sentence is determined by a judge and the second sentence is fixed by operation of law. In Texas, the trial court judge sets the maximum sentence. The minimum

30

sentence is set by operation of law. Depending upon the Texas legislature, the minimum sentence can be one quarter or one third of the maximum sentence. The actual sentence served by an inmate falls somewhere in between the minimum and maximum sentence.

63. Felonies in Texas have been divided into five categories. A capital felony is punishable by death or by life in prison. The maximum punishment for a 1st degree felony is either Life or not more than 99 years. The minimum sentence is 5 years. The maximum punishment for a 2nd degree felony is 20 years. The minimum sentence is 2 years. The maximum punishment for a 3rd degree felony is 10 years. The minimum sentence is 2 years. The punishment for a state jail felony is two years. The minimum sentence is 180 days.

64. Texas has sentencing enhancements. Instead of adding a fixed number of years to the primary sentence, a sentencing enhancement causes an upward departure to the next statutory tier. One prior felony conviction moves a 3rd degree crime to a 2nd degree crime, where the maximum sentence is 20 years instead of 10 years. Similarly, a prior felony moves a 2nd degree crime to a 1st degree crime, where the maximum sentence can be 99 years instead of 20 years. A prior felony enhances a 1st degree felony by raising the minimum sentence from 5 years to 25 years. The applicability of a sentencing enhancement can outweigh the time connected to the offense of conviction.

65. Two prior felony convictions are also an enhancement. Regardless of whether the third felony is a 1st degree, 2nd degree or 3rd degree crime, an upward departure occurs to a 1st degree felony with a minimum sentence of 25 years to a maximum sentence of Life.

66. Because of enhancements, many offenders with current 2nd and 3rd degree crimes are in the statutory tier reserved for a 1st degree crime. The cap upon the amount of time to serve in this 1st degree statutory tier is set by a judge. The maximum sentence can be any number above five years up to 99 years. However, the actual sentence to be served between the maximum and minimum termini is determined by the Parole Board.

**Good Conduct Time, Work Credit and Programming Credit**

67. Inmates periodically receive time sheets. Time sheets track three different kinds of time. (1) Flat time refers to Calendar time. (2) Good Time is self explanatory, and refers to time without any problems. (3) Work Credit refers to time devoted to working in a prison industry or upon a prison job. At the end of these time sheets, the totals are compared to the maximum prison sentence to be served. As flat time, good time and work credit begin to approach their maximum sentence, inmates justifiably begin to feel optimistic about leaving prison.

68. The Legislature has allowed Good Time, Work Credits and Program

Credits to expedite the initial parole review. This applies to most inmates.

69. Once an inmate gets past their parole eligibility date, the progress indicated on these time sheets becomes illusory, because Good Time and Work Credit cannot be counted upon to be applied to a release date. Many Plaintiffs accrue Good Time and Work Credit until their totals exceed and even double their maximum sentence. Nevertheless, these class members remain in prison. In short, Good Time and Work Credit become meaningless.

70. Hereafter, references to Good Time and Work Credit shall refer to these kinds of time credits solely. References to *good conduct time* shall include any and all available forms of time credit, excluding calendar time.

71. Good Time and Work Credits are products of different Legislatures. Good Time has been credited to Texas prisoners from the inception of the prison system. Work credits, on the other hand, only appeared in 1988.

72. The data reflected on these time sheets is generated by Classification. These time sheets attest to the capacity of the Classification and Records division to give individualized attention to all parole candidates.

## Significant Legislation Impacting Upon Parole

73. During the 65th Legislature (1977 – 1979), Texas enacted what has

come to be known as its $1/3^{rd}$ law.[11] Under this legislature, if an inmate served one-third of their sentence, they became eligible for parole.

74. In computing time-served to one-third of the sentence, each inmate received one day of Good Time for every day of calendar time served, plus between 30 to 45 days of additional Good Time for every program completed, and additional Good Time credit if their security level status was changed for the better. Hereafter, credits for good time, for programs completed and for positive status changes are referenced as Good Time.

75. Under the law enacted by the 65th Legislature, Good Time was not discretionary. This law was in force from 1977 to 1987. If an inmate was not released on parole, they could count upon getting released when their Flat Time and Good Time equaled their sentence. This was known as the Mandatory Release Date. Further, when the accumulation of Flat Time and Good Time equaled their sentence, they were entitled to a full discharge from their crime.

76. Under the 1/3rd law enacted by the 65th Legislature, a life sentence equaled sixty years.[12] Calendar time and good time were both factored into the equation for reaching 60 years. The actual time required to satisfy this 60 year

---

[11] 65th Legislature – Regular Session, Mandatory Supervision Release Program, Chapter 346, S.B. No. 152.

[12] *See* Rummel v. Estelle, 587 F.2d 651, 656 (5th Cir. 1978).

sentence varied. If the inmate qualified for State Approved Trusty Class I, II, III, or IV, the calendar time would equal between 24 to 26 years. If the inmate was in Line I, they would have to serve 36 ½ years. Under the law in force from 1977 to 1987, the Parole Board had no authority to repeal earned and accrued Good Time, and they could not block the release of inmates after their sixty years had been accrued.

77. During the 70th Legislature (1987 – 1989), Texas enacted what has come to be known as its ¼ law. Under this legislature, if an inmate served ¼ of their sentence, they became eligible for parole.

78. In computing time toward serving ¼ of their sentence, each inmate received one day of Good Time for every day of flat time served, plus ½ day of work credit for every day of flat time served. Like the 1/3[rd] Legislature, the Good Time and Work Credit earned under the ¼ law was not discretionary. If an inmate was not released on parole, they could count upon getting released when their Flat Time, Good Time and Work Credits equaled their sentence. This was known as the Mandatory Supervision Date.

79. Unlike the 1/3[rd] law, the accumulation of good time, work credit and flat time equal to the sentence did not function as a complete discharge from the crime. Instead, inmates were forced to relinquish their accumulated good time and work credit upon being released to supervision. Further, inmates

remained under supervision until their crime had been discharged day for day. This law prevailed from 1987 up to September 1, 1996.

80. Another significant amendment was made by the 70th Legislature. 13 crimes were enumerated and, if an offender had been convicted of one of these crimes, they were ineligible for Mandatory Supervision.[13] In these cases, the offender's earned good time served only one purpose, and that was to move forward their initial eligibility for parole. Good time and work credit could not be applied toward early release. For the first time, the Parole Board acquired authority to make certain enumerated offenders serve their entire sentence day for day.

81. If an offender is sentenced to Life for a capital murder, a new law passed by this legislature required 35 calendar years before they became eligible for parole.

82. The 70th Legislature also passed a law determining how consecutive sentences were to be served. Offenders had to become parole eligible on each of the sentences before they can be released on parole. In practice, this meant that an offender had to earn time credit on all sentences, one after another,

---

[13] These 13 enumerated crimes consisted of: (1) Murder, 1st degree, (2) Capital Murder, (3) Aggravated Kidnapping, (4) Sexual Assault, 2nd degree, (5) Aggravated Assault 2nd or 3rd degree, (6) Aggravated Sexual Assault 1st degree, (7) Deadly Weapon on Law Enforcement, Corrections Officer or Court Pariticipant, (8) Injury to a child or elderly individual, (9) arson 1st degree, (10) Robbery 2nd degree, (11) Aggravated Robbery, 1st degree, (12) Burglary 1st degree if armed or possessing explosives or a person is threatened or injured, and (13) any offense when the judgment contains an affirmative finding of a deadly weapon.

until parole eligibility was reached upon the last sentence.[14]

83. During the 74th Legislature (1995 – 1997), Texas amended its Mandatory Supervision law by stipulating that an offender whose crime occurred on or after September 1, 1996 will not be considered for mandatory supervision if a Parole Panel found; (1) the inmate's accrued good conduct time is not an accurate reflection of the inmate's potential for rehabilitation; and (2) the offender's release would endanger the public.[15] This became known as Discretionary Mandatory Supervision.

84. The law passed by the 74th Legislature was considered surgical in nature. This new law gave the Parole Board a lever to close the automatically open door of Mandatory Supervision for special cases where the inmate was not suited for returning to society, while still preserving the intent of the 70th Legislature, which was to provide supervised release for most offenders. The Discretionary Mandatory Supervision date retained the vested liberty interest found in the Mandatory Supervision, in the form of a presumption favoring release, while placing the burden on the Parole Board to justify non-release.

85. During the 75th Legislature, three new crimes were added to the list deemed ineligible for Mandatory Supervision: (1) Murder, 2nd degree and (2) Indecency with a Child, 2nd degree and (3) Indecency with a Child, 3rd degree.

---

[14] *See* V.T.C.A., Government Code, § 508.150.
[15] 74th Legislature, H.B. 1433 Comm. Report (Amended).

This brought the list of crimes ineligible for Mandatory Supervision to 15.

## 3(g) Crimes

86. Section 3(g) of Article 42.12 of the Texas Code of Criminal Procedures was amended by the 70th Legislature to create a new class of offenses, called 3(g) crimes after the section where these were enumerated. A 3(g) crime is considered an aggravated crime. If an offender has been found guilty of a crime enumerated under this section, they are disqualified from receiving the benefit of an accelerated parole review due to the accumulation of good time and work credits. These offenders had to serve the first ¼ of their sentence day for day. Only offenders convicted of a 3(g) offense must serve flat time. In all other cases, Good Time and Work Credit count toward parole.

87. Initially, five crimes were deemed aggravated. The 70th Legislature considered (1) Capital Murder, (2) Aggravated Kidnapping, (3) Aggravated Robbery, (4) Aggravated Sexual Assault and (5) proof that a deadly weapon had been used in the commission of the crime to be aggravated.

88. The 73rd Legislature amended the law enumerating 3(g) crimes in two significant respects.[16] Offenders convicted of aggravated crimes under this section had to serve the first half of their sentence day for day, before they could become eligible for parole. Previously, only ¼ of the sentence had to be

---

[16] This legislature deleted the crime of deadly assault on a law enforcement officer as Non-Mandatory Supervision Offense. This list of crimes was reduced to 12.

served day for day. In addition, two new crimes were made aggravated: (1)

Indecency to a child 2nd degree and (2) Murder, 1st degree.

### Additional Statutory Amendments Affecting Parole

89. In addition to crimes deemed ineligible for Mandatory Supervision

and aggravated crimes as enumerated in section 3(g), one more category was

adopted. The 72nd Legislature required all offenders convicted of Capital

Murder to serve 40 calendar years and further required at least a two-thirds

vote of the entire 18 member Parole Board for granting a parole. In the 74th

Legislature, the crime of indecency with a child was added to this list, and this

crime also required a two-thirds vote of the entire Parole Board for release.

90. The 74th Legislature enacted a new enhancement. If an offender has

ever been convicted of a Non-Mandatory Supervision Offense or a 3(g) crime

in the past, this prior conviction would make them ineligible for Mandatory

Supervision.

### Inmate Labor and Slavery

91. A search of the Texas Constitution reveals no trace of the word

*slavery* or any reference to the use of inmate labor as slaves. Nevertheless,

Texas has a long and unbecoming history of resisting the economic integration

of Blacks into its society and exploiting the use of inmates as slave labor.

92. The 13th Amendment to the U.S. Constitution states in pertinent

part: "Neither slavery nor involuntary servitude, except as a punishment for crime … shall exist within the United States." The 13th Amendment was formally adopted on December 18, 1865. Texas was not among the states ratifying this amendment. In 1866, participants at a Constitutional Convention took the position that it was unnecessary to adopt this amendment. By taking an oath to support the United States Constitution, they had indirectly abolished slavery and this was sufficient. It was not until February 18, 1870, that Texas formally adopted the 13th Amendment, and this was only done grudgingly, to satisfy conditions for gaining admission back into the Union.

93. Inmates perform valuable services in their prisons and in a multitude of different prison industries. Without inmate labor, these prisons and prison industries could not function. From the inception of its prison system, Texas historically refused to pay its inmates any wages for their work, no doubt relying upon the clause carving out an exception for inmate labor in the 13th Amendment of the U.S. Constitution as their authority for doing so.

94. The 70th Texas Legislature reversed this long standing practice and policy by creating Work Credits as part of its major overhaul of the parole system. Under the ¼ law, as this legislation came to be called, these work credits vested when earned, and hastened an inmate's Mandatory Supervision Date. Since this law was enacted, inmates have been receiving a half day of

Work Credit for every day of calendar time served.

95. During the term of the 74th Legislature, from 1995 to 1997, the Parole Board's ability to perform its statutorily delegated function of reviewing all parole candidates, applying the Texas parole guidelines to their cases and issuing decisions as to their fitness for parole was clearly illusory. The Parole Board was vastly lacking the staff and resources to perform this task. Nevertheless, the 74th Legislature increased the authority of the Parole Board by giving them the right to cancel an inmate's work credit, simply upon a finding that the offender's release could endanger the public's safety.

96. A finding that an offender's release could endanger the public's safety is ambiguous, vague and vulnerable to abuse. It is further submitted that Plaintiffs have seen their Mandatory Supervision Date pass as well as their good time and work credits rescinded for just this reason, with no factual basis and no reasoned decision to support this finding and for taking this action.

**Emasculation of Parole Board Resources and Personnel**

97. From 1977 to 1987, when the Parole Board presumably had the staff and resources to give individual attention to inmate cases, their power was very limited. Every inmate eligible for parole under the 65th Legislature could count upon early release once their flat time and good time credits equaled their sentence, and no approval from the Parole Board was needed. Even more

41

important, the Parole Board was powerless to hold an inmate for every calendar day of their maximum sentence.

98. In 1989, voters approved a constitutional amendment to merge every agency involved in the administration of criminal justice into one giant department called the Texas Department of Criminal Justice. These Defendants interpreted this mandate from Texas voters as sanctioning the act of separating the Parole Board from its central staff and resources, while continuing to hold the Parole Board responsible for making release decisions for all parole candidates.

99. Just as it was abundantly evident and foreseeable that the Criminal Justice Reform Act of the 71st Legislature would transform the Parole Board into a puppet entity of the Texas Department of Criminal Justice, the 70th Legislature significantly expanded the Parole Board's authority. For the first time, the Parole Board was given authority to strip offenders of their good time credit if they did not make parole at their first hearing. This new law further empowered the Parole Board to require offenders committing 13 enumerated crimes to serve their entire sentence day for day.

100. By 1993, the implementation of the Criminal Justice Reform Act enacted by the 71st Legislature was complete. The Parole Board's loss of personnel and resources left it incapacitated and hopelessly under staffed for

analyzing the high volume of parole cases referred, and therefore incapable of performing its assigned statutory task.

101. Despite loss of their ability to provide individualized attention to every parole candidate, in 1996, the powers of the Parole Board were significantly enlarged *again*. For the first time, the Parole Board acquired the right to make all offenders serve their entire sentence day for day. For the first time, the Parole Board acquired authority to withhold the application of good time and work credit toward early release for all offenders. Upon finding that an inmate still posed a danger to the public's welfare, a parole panel had authority to render good time and work credit meaningless for any inmate, regardless of their crime.

### Suitability Criteria for Parole

102. According to the Texas Department of Criminal Justice Offender Handbook, the Government Code and Title 37 of the Texas Administrative Code, only the following factors are germane as to whether or not an offender is suitable for parole.

> (a) The offender has served the sufficient amount of time for their crime as required by the law. [17]

> (b) The offender is not a risk to society.[18]

---

[17] *See* V.T.C.A., Government Code, § 508.145. *See also* Offender Handbook, at p. 60.
[18] *See* V.T.C.A., Government Code, § 508.141 (d) and Offender Handbook, at p. 60/

(c) The offender meets work, program participation and behavior standards.[19]

(d) The offender must not have a major disciplinary misconduct report in the 6 month period prior to being reviewed for parole.[20]

(e) The offender's security classification must be the same or higher than the security classification assigned upon entering T.DC.J.[21]

(f) After receiving an affirmative vote for parole, the offender must not be reduced below their initial security classification status and they cannot lose any good time. If either of these events occur, their parole will be subject to being reviewed and parole could be rescinded.[22]

(g) Finally, arrangements have been made for the inmate's employment or for the inmate's maintenance and care.[23]

103. These governing statutes and regulations restrict the Parole Board's review and, concomitantly, their exercise of discretion, to whether or not the parole candidate poses a danger to the public if released.

104. There is nothing in the Texas Government Code, the Offender Handbook or Title 37 of the Texas Administrative Act giving the Parole Board authority to review the offense of conviction and make a decision to grant or deny parole based upon factors which cannot change [hereafter *unchanging*

---

[19] *See* Offender Handbook, at p. 60.
[20] Texas Administrative Code. Title 37, § 145.3 (3) (A).
[21] Texas Administrative Code. Title 37, § 145.3 (3) (B).
[22] Texas Administrative Code. Title 37, § 145.3 (3) (C).
[23] *See* V.T.C.A., Government Code, § 508.141 (e)(1)

*factors*], such as the offense of conviction or a past criminal history.

105. There is nothing in the Government Code, the Offender Handbook or the Texas Administrative Code linking suitability for parole to the nature of the crime committed.

106. The Parole Board acts arbitrarily and beyond its scope of review when it bases its decision on facts which cannot change, while simultaneously ignoring affirmative conduct and evidence germane to the question of whether or not the parole candidate poses any danger to the public.

**Buffering Impact of Maximum Sentences and Honoring Plea Bargains**

107. Under the penological philosophy for an indefinite sentencing scheme, two sentences are issued and each sentence serves a specific purpose. The maximum sentence rendered by a judge is to serve as a deterrent. The minimum sentence issued by operation of law is there to reward an inmate and encourage them to address their anti-social behavior. Both sentences should maintain their respective magnetic properties. If an inmate has conformed to the rules, taken advantage of programs and served their time in an exemplary manner, they should be rewarded with a release at the minimum sentence. The maximum sentence is there for inmates unwilling to address antisocial behavior.

108. While parole in Texas is a privilege, the prospect of parole

eligibility and consideration has been mandated by statute. The Texas legislature has required its Parole Board to promulgate parole guidelines with minimum release criteria. Every inmate convicted of a 1st, 2nd, 3rd degree or a state jail felony has a statutory right to be considered for parole. For a non-violent and non-aggravated felony, parole eligibility requires the accumulation of flat time, good time and work credit equal to either one-quarter or one-third of the sentence. If the crime is enumerated in paragraph 3(g) of Art. 42.12, either half or one-quarter of the calendar sentence, depending upon the law in force at the time, must be served before becoming eligible for parole.

109. Between the minimum sentence established by operation of law and the maximum sentence set by a trial court judge, the Parole Board ultimately decides the actual amount of time to be served. In theory and in practice, the Parole Board can release an offender after the minimum sentence has been served or hold them to the last day, making them serve until their sentence has expired. The parole board is one of the most secretive agencies of state government. Inmate cases are decided in private and most of its records are not subject to public review.

110. When an offender accepts a plea agreement, the terms of this plea agreement incorporate the milieu of Texas statutes, Administrative Rules and Parole Board guidelines impacting upon prison terms. This includes the right

to be qualified for parole in accord with the statutes, administrative rules and parole guidelines prevailing at the time of conviction. This further includes the right to be judged suitable for parole in accord with statutes, administrative rules and parole guidelines prevailing at the time of conviction.

111. In an indeterminate sentencing scheme, reliance necessarily falls upon the Parole Board to immunize the harsh, maximum judicial sentences by honoring an inmate's accrued *good time* and granting paroles consistent with judicially sanctioned plea agreements. Under parole board statutes, administrative rules and guidelines of the 1970's up to 1992, most Texas offenders could count upon being paroled, if not at the first hearing, then after one remedial continuance.

112. Collectively, these statutes, administrative rules and parole guidelines imparted the certainty that defense counsel and defendants required. These statutes, administrative rules and parole guidelines established what would be expected from the defendant once in prison, and what the defendant could expect in return from the state. Without these statutes, administrative rules and parole guidelines, both parties would be dealing in a vacuum. Only a very unusual defendant would sign a plea agreement that could require 50 years of service, without firm proof the maximum sentence would not apply to them.

113. The Texas legislature requires the Parole Board to adopt and to apply parole guidelines.[24] This mandate has been implemented by the Texas Administrative Code.[25]

114. In response to this legislative mandate, the Parole Board adopted its first guidelines in August of 1987. These adopted parole guidelines combined measurements for both the severity of the crime and past criminal history (i.e. risk of recidivism) into one scoring instrument. This instrument was called the Pablo Score, named after Dr. Pablo Martinez, who developed the instrument.

### Pablo Scoring Instrument

115. The Pablo Scoring instrument required two calculations. The first calculation was required for the recidivism score. A table listing and grading recidivism factors produced a numerical profile of the offender.[26] The resulting number produced at the end of a tally placed the risk score into one of four categories: Low, Medium, High and Aggravated. Each of these categories was assigned a score. If an inmate's score was Low, they received a score of 30. Medium was assigned a score of 26. High was assigned a score of 18.

---

[24] *See* V.T.C.A., Government Code § 508.144 (a).
[25] *See* Texas Administrative Code, Title 37, § 145.2
[26] This table included the following factors: (1) prior convictions; (2) prior incarcerations; (3) age at the first commitment; (4) commitment offense; (5) parole or probation revoked; (6) drug and / or alcohol dependence; (7) employment; (8) eduction and (9) release plan. *See* Plaintiffs Exhibit _. Pablo Based Parole Score Computation.

Aggravated was given a score of 0. These assigned scores were the final product of the first calculation.

116. The second calculation involved the time served to date as a percentage of the maximum sentence. If the maximum sentence was 120 months and 36 months had been served to date, the result was 30% of the sentence. The second calculation produced a factor of 30.0.

117. The Pablo Score also used two constants. The first of these constants was for the severity score, meaning a rating for the current crime. Like the four categories for Risk Scores, there are four categories for severity or offense scores. If the crime is of low severity, the constant is 1.7. Both a medium and a high severity crime received a 2.0 constant. An aggravated offense received a 3.0 constant. The second constant employed in the Pablo Scale was called simply the *Constant*. Its number of 1.9 was applied to everyone's score.

118. To calculate a score under the Pablo Scale, you took the result of the first calculation (i.e. the recidivism score's assigned weight of 30, 26, 18 or 0) and you divided this score by the severity score constant (i.e. 1.7, 2.0 or 3.0). To illustrate, let's assume that we have a fictional offender with a 26 risk score and a 2.0 constant for the severity factor. The result of 26 divided by 2.0 equals 13. The number 13 is the first of three factors dictating the end result.

Next, we take the second calculation involving the time served to date. Let's assume this fictional offender served 36 months of a 120 month sentence. The result is 30% or 30. The Pablo formula calls for adding 13 to 30, equaling 43, which is the second of three factors. Finally, we multiply 43 by 1.9, the last constant. The result is 81.7. If an inmate's score equals or exceeds 80, they are entitled to a parole. Under the equation just described, an offender with a medium severity crime plus a medium level criminal history risk score would qualify for parole after serving 30% of their maximum sentence.

119. The Pablo Score removed the mystery from parole. It was impossible to qualify for parole without serving 25% of the sentence. After serving 25% of the sentence, first time offenders with low level crimes could count upon making parole. The dominant factor in the equation was the time served to date as a percentage of the maximum sentence. In the formula applied, the factor of 30 – the percentage of the sentence served – is twice the factor produced by the risk score and the severity or offense constant. Offenders in the medium category would serve about one-third of their sentence or less. Even a fictional offender with a high risk score and a high severity score could expect to serve about 37% of their maximum sentence. [27]

---

[27] This fact can be demonstrated through a second fictional offender. Assuming an 18 Risk Factor, which is high, coupled with an also high 3.0 severity or offensive score, produces an initial factor of 6. Further assume a 240 month maximum sentence. This offender would be

**Abandonment of Pablo and Re-examination of Guidelines**

120. In 1993, the Texas legislature directed the Criminal Justice Policy Counsel to monitor utilization of the Parole Board's guidelines and report to the legislature on use of the Pablo Scoring instrument by each Board Member. In 1994, the Criminal Justice Policy Counsel reported that no such statistics could be reported, because there was no valid computerized data for analysis.

121. In 1997, the Criminal Justice Policy Counsel submitted a report to the Governor and the legislature indicating that the Parole Board had not updated the elements of its parole guidelines since 1987.

122. In 1997, the Parole Board submitted an application to the National Institute for Corrections for assistance, which recommended a fundamental re-examination of the parole board's guidelines, utilizing a professional consultant. The Parole Board awarded a contract to Security Response Technologies on December 27, 1999, to design new parole guidelines.

123. At a January 18, 2001 meeting of the Parole Board, the guidelines promulgated by Security Response Technology were formally adopted.

**Security Response Technology's Parole Guidelines**

124. Like the Pablo Scoring instrument, the Security Response Technology scoring instrument contains a list of recidivism factors which have

---

entitled to a parole after a serving 90 months or 37.5% of their maximum sentence. [Factors 6 plus 37.5 = 43.5 times 1.9 = 82.65]

been given a new name, *Static Items*, reflecting the fact that these factors cannot change. Like the Pablo Scoring instrument, the tally from these recidivism factors engages one of four categories, Low Risk, Moderate Risk, High Risk and Highest Risk.[28]

125. The Security Response Technology instrument adopts a matrix sentencing approach. The four risk categories engaged by the Static Items (i.e. recidivism factors) are aligned along the horizontal axis.

126. Next, the inmate's current crime is assigned a severity rating. The Parole Board has assigned an offense severity rating to 1,931 felony charges listed in the F.B.I.'s National Crime Information Center, better known by its acronym *NCIC*. No explanation has been given for attaching severity ratings to the Federal Government's NCIC crime catalogue instead of linking these to sections of the Texas Penal Code, under which Plaintiffs were convicted.

127. The Parole Board defines its severity rating as follows, "An offender's most serious active offense is assigned an Offense Severity Class according to the established list." Nothing in this statement requires the severity rating to be based upon the judgment of the trial court.

128. The overt act of assigning offense severity scores to crimes in the

---

[28] Contrary to the Pablo Scoring instrument, where a high number was beneficial, under the Security Response Technology scoring instrument the objective is to achieve a low score. The range for Low Risk is 0 to 5, for Medium Risk it is 6 to 8, for High Risk it is 9 to 11 and for Highest Risk, it is 12 +.

NCIC index as opposed to the Texas Penal Code, and the material omission of not requiring the severity rating to be based upon the offense of conviction, collectively guarantee that the severity rating will not mirror the trial court conviction. In effect, the Parole Board has declared its independence from the Texas judiciary, and reserved unto itself the unilateral right to independently determine this severity rating.

129. The offense severity rating is aligned along the grid's vertical axis. Like the Pablo Scoring instrument, there are four offense severity categories; highest, high, moderate and low. The offense severity rating attached to an NCIC code dictates the placement along this vertical axis.

130. In some cases, there is no NCIC code that can match the conviction of a class member, because the offense is uniquely Texan in character.[29] When there does appear to be a match between the NCIC code and the Texas code violation, the similarity may be superficial. Upon close examination, elements may differ between the contemplated crime under the F.B.I. code and under the Texas Code. Just the act of adopting NCIC codes instead of attaching codes to Texas crimes makes any match between them conjectural.

131. Typically, the boxes inside a Parole Board's matrix sentencing grid

---

[29] For example, there would be no NCIC match for the crime "Indecency with a Child 2nd degree" and "Indecency with a Child 3rd degree." There is also no NCIC match for a technical parole violation.

contain numbers defining a sentencing range. For example, an inmate with a low risk score and a moderate crime might find their scores intersecting at a box with numbers 48 to 60, standing for 48 to 60 months. In this manner, a matrix sentencing grid dictates a range of time, typically termed the *guideline range*, reflecting both the crime committed and the inmate's criminal history. The guideline range is sandwiched between two timelines, one drawn at 48 months and the other at 60 months. These timelines serve as benchmarks delineating the entering and upper most boundaries of a guideline range.

132. The matrix sentencing grid formulated by Security Response Technology contains no such guidance. Instead of a range of months, there is simply a number. For example, taking a fictional offender with a low risk score but a high offense severity rating, the intersection of these two scores contains the number *4*.  Under the number *4*, there is a probability range, specifically 21% to 35%. This number *4* appears in four squares. Each square contains this same percentage. If you fall into a square with *4* in it, you have a 21% to 35% chance of gaining parole.

133. Unlike the typical matrix sentencing grid, probability scores are assigned in lieu of guideline ranges. Every square in this grid affords some possibility for parole. For the square reserved for the highest criminal history and the most horrific crime, the probability for parole is 0 to 5%. Conversely,

54

every square also allows for denial of parole. The lowest risk score and the lowest level crime converge on a square with a 76% probability for achieving parole, meaning that one out of four parole candidates will be denied.

134. Unlike the matrix grid employed by the Federal government's parole commission and other states, there are no benchmarks for time served, delineating guideline ranges considered appropriate for specific crimes.

135. Without benchmarks for entering and leaving delineated guideline ranges linked to specific crimes, there is no answer to the penological question as to how much time is sufficient for the commission of a crime.

136. Without benchmarks for entering and leaving delineated guideline ranges linked to specific crimes, there is no guidance for a parole candidate as to how much time must be served before qualifying for serious parole consideration. At the square where risk scores and offense severity scores converge, there is no guidance as to when a parole can be earned in the future.

137. The Security Response Technology instrument can be more readily analogized to squares on a roulette table. Every square affords an opportunity for realizing a parole (i.e. winning) and every square affords an opportunity for denial (i.e. losing). Like squares of a roulette table reserved for odd and even numbers, the chances of winning improve upon some squares as opposed to others. Beyond this ambiguous and universal truth, nothing further can be

determined for certain from squares on this sentencing grid.

138. The Security Response Technology instrument is a sham because it does not serve the fundamental purpose implicit in any guideline, which is to protect individuals subject to a governmental regime from arbitrary and capricious decision-making by structuring and restricting the exercise of discretion, thereby affording guidance as to how they will be treated and a reasonable expectation as to when they can qualify for benefits conferred.

139. The Security Response Technology instrument suffers from other flaws. This instrument does not take into account how much time the inmate has served. The time-served factor is typically given paramount importance.

140. Because the NCIC coding mechanism is devoted exclusively to crimes, the Security Response Technology instrument cannot be applied to thousands of Texas offenders incarcerated for a technical parole violation.

### Promulgating the General Offense Character for Inmates

141. Parole administrators in general feel entitled to make their own independent appraisal of an inmate and their crime. When this assessment is complete, it is legitimized and generically referenced by a term such as *total offensive behavior* or, as it is called in Texas, the *general offense character.*

142. The term *general offense character* refers to the practice of departing from the factual findings of the trial court to support a more

prejudicial level of criminal activity, which invariable engages a harsher method for serving a sentence. In Texas, *general offense character* can encompass crimes dropped from an indictment, crimes dismissed, acquitted conduct on appeal, criminal complaints never acted upon and virtually any behavior that has somehow found its way into an inmate's criminal history. There is another universal attribute of the *general offense character* assessment. Its ingredients consist exclusively of unchanging factors, primarily the inmate's current crime and their past criminal history.

143. Classification is responsible for prompting all parole reviews. For an inmate's initial review, the *case pull list* identifies all offenders eligible for parole six months ahead of the date required. For all successive reviews, the *case pull list* is retrieved four months early. During this initial 6 month review, Classification pieces together its *general offense character* assessment.

144. Classification maintains a centralized offender record system to systematically group offenders. The process of formulating a *general offense character* assessment or score begins by organizing all crimes committed under the following headings: (1) Violent Aggravated Non-sexual, (2) Violent Aggravated Sexual, (3) Non-aggravated Sexual, (4) Non-violent, (5) Violent Non-Aggravated Non-sexual, and (6) Unclassified. Of these six categories, only two, Non-violent and Unclassified, qualify for crediting of good time and

work time credit toward Mandatory and Discretionary Supervision. All of the other categories disqualify an offender from qualifying for this treatment.

145. Next, Classification looks at an inmate's crime and their past criminal history. In conducting this review, Classification does not feel itself constrained by facts found to be true by a trial court or acknowledged in a plea agreement. The object of this review is to place the offender in one of the above enumerated violent or aggravated classifications, where Mandatory and Discretionary Mandatory Supervision can be effectively challenged, and much of the sentence must be served day for day.

146. To achieve this end, Classification looks to the indictment and considers offenses dropped or dismissed as a result of a plea, at prior arrests never resulting in a conviction, and at facts which could have been charged as crimes but, for reasons unknown, were not charged. Any information, including unsworn and unproven statements by third parties and information previously found to be discredited and in error, can be utilized for the purpose of coloring the offender as violent or the crime as aggravated. The first step in assembling the *general offense character* score consists of looking for incriminating facts which place the offender in one of the four violent or aggravated groups, thereby disqualifying them from Mandatory or Discretionary Mandatory Supervision and possibly subjecting them to serving

up to half their sentence day for day.

147. Once an offender is placed in one of these enumerated groups, Classification applies the harshest set of rules applicable to this group as a whole, regardless of when the crime was committed. For example, the 73rd Texas legislature amended a prior law which applied to 3(g) crimes. Instead of having to serve ¼ of the sentence day for day, as stipulated by the 70th legislature, an offender was required to serve half the sentence day for day. Classification applies the rule passed by the 73rd legislature even if an inmate committed a 3(g) crime when the ¼ law was in force.

148. Next, Classification looks at the trial court's sentence. If an offender has been given a sentence of 10 years or less, which are considered by Classification to be short, the *general offense character* score will require the inmate to serve just about all of this sentence. If the offender committed a sex offense, Classification will apply a high percentage, typically 80% of the time or higher, and translate this percentage into a figure standing for the number of years to be served. These examples are illustrative, not exhaustive.

149. Clerks and administrators in Classification mechanically apply the same formulas to all cases within each group. These formulas contemplate hardened, predatory offenders committing horrific crimes, and the required amount of time to be served reflects these defining attributes. The application

of this formula serves as a substitute for giving individualized attention to inmate files. As a result, first time offenders and inmates with strong mitigating circumstances find themselves painted with the same brush and treated just as if they were also hardened, predatory offenders with horrific crimes. In this manner, formulas erase individuality among inmates and interject a faceless and thoroughly evil demeanor to inmates generally.

150. Plaintiffs maintain that Classification utilizes a formula pegged to the *general offense character* score. This *general offense character* score usurps the crime and becomes the driving force dictating the time to be served.

151. At the conclusion of this initial review, Classification places a number on an inmate's file in a confidential and classified box, which an inmate is not allowed to see. This number on the file dictates how much time should be served for the inmate's current crime. Furthermore, this decision is made by clerks and administrators in Classification, working with unpublished and highly secret guidelines and formulas promulgated by these Defendants.

152. The number placed on the inmate's file guarantees that the inmate receives only a paper review and not true release consideration at their first hearing. The inmate's file will go through the bureaucratic formalities of a parole review, but the decision will be made before the process begins, and that decision will be to deny parole, often not only for the first review, but for

succeeding reviews until the number on the file matches or is exceeded by the years served for a scheduled future review.

153. If an inmate is called to a county because of a bench warrant, they will be interviewed before returning to the T.D.C.J. system. The interview may be conducted by another, but the information retrieved will be sent to Classification. During these interviews, prejudicial facts are seized while mitigating or totally nullifying facts are ignored. Once these facts are reported to Classification, an inmate's file is pulled and their *general offense character* score is amended by the addition of these prejudicial facts.

154. In this manner, Classification is dedicated to the pursuit of negative and incriminating information, while putting impediments in the way of good reports and evidence of rehabilitation. Classification also embraces erroneous records. Irrefutable evidence exposing errors are trumped by faulty internally generated documents. In some cases, Classification becomes a source of erroneous reports, as when they mistakenly place a negative record into the file of an inmate with the same last name. In due course, this erroneous report finds it way to the inmate's travel card and becomes embedded in their profile. The net effect of this process is to stack the record with factors prejudicial to the interests of an inmate, while simultaneously ignoring or excluding positive records.

155. As inmates are held for increasingly long periods of time, due to a

succession of *paper reviews* instead of true release hearings, Classification will pull an inmate's file and take overt actions, such as soliciting unsworn and unverified statements from victims to further vilify an offender, thereby updating their *general offense character* score and justifying, in a *post hoc rationalization* manner, the decision previously made to hold them so long.

156. Classification has a conflicted position vis-à-vis parole. If the Parole Board could decide which inmates were to be granted paroles based solely upon the merits of the applicant and pursuant to the parole suitability criteria as outlined above, racial quotas could come out of balance and exiting inmates could exceed new arrivals, causing the total prison population to decline and leaving vacancies reflected in unused beds. To insure this does not happen, Classification conducts additional checks, even when the years required by their initial review have been fully served.

157. Once the years served equal or exceed the number affixed to the file at this initial review, Classification compares the number of inmates entering the T.D.C.J. system to the number of inmates leaving. If the number entering prison does not equal or exceed the number scheduled for departure, Classification will review and possibly amend their prior number and require additional time. The basis for adding this extra time has nothing whatsoever to do with the inmate. This decision is driven solely by business considerations,

to keep the prisons full.

158. If the years served equal or exceed the number affixed to the file and a review of entering inmates reveals numbers running ahead of inmates departing, the file will be flagged for individualized attention by the Parole Board. These files will be sent to the Parole Board with a notation that this inmate has been cleared by Classification for a parole, subject of course to the Parole Board's independent approval. For inmates unrepresented by counsel, these are the only cases that the Parole Board truly considers and gives individualized treatment. [30]

159. In summary, for the preponderate bulk of parole candidates, the Parole Board only knows what the Classification and Records division chooses to tell them. By controlling the flow and content of information, Classification and Records manipulates and orchestrates the Parole Board's decision-making.

**Function Performed By Institutional Parole Officers**

160. After Classification has done its work, the file for a parole candidate is sent to the institution where the inmate is being housed. In transmitting records for parole candidates, the Classification division should confine its transmitted records to items bearing upon suitability for parole as enumerated in the Offenders' Handbook, provisions of the Texas

---

[30] An attorney does force the Parole Board to do its own review, even if Classification tagged the file for denial. But even an attorney cannot always overcome this denial tag.

Administrative Code and the Texas Government Code. Instead, Classification transfers records which exceed these parameters and emphasize factors which cannot change, such as the most gruesome aspects of the current crime and past crimes. In addition, Plaintiffs maintain that these files are transmitted with a tag dictating the amount of time deemed suitable for the crime, in Classification's opinion.

161. Every prison has an institutional parole officer or examiner. This title is misleading. This institutional parole officer or examiner has no decision-making authority over matters concerning the granting or denying of parole. The function performed by this parole officer or examiner is closely akin to a clerk in the records office. Instead of working with files related to sentences, this institutional parole officer is working with parole files.

162. Parole files come from the central office. Typically, these files are dominated by papers relating to the current crime. Typically, records documenting a parole candidate's program achievements and work evaluations are missing. The evidence best calculated to answer the predictive judgments engaged by a parole review is not available for review. Stated differently, most of the evidence contemplated by the suitability criteria for parole is missing.

163. When a file has already been tagged by Classification for the denial of parole, there is no incentive for the institutional parole officer to

comb through these papers and look for good reports and evidence of rehabilitation. Instead, there is an opposite incentive. To further support the finding of Classification, institutional parole officers have a strong incentive to go through these files and find negative reports, particularly recent disciplinary cases. Institutional parole officers are primarily engaged in the task of adding disciplinary cases to buttress the finding of Classification.

164. A summary of the parole file is then prepared by the institutional parole officer or examiner. If the inmate has not been cleared by Classification for release, an interview is conducted by the institutional parole officer or examiner. These are paper reviews. This institutional parole officer creates the appearance of parole consideration, while simultaneously camouflaging the lack of serious parole consideration. In the rare case when the file has been cleared by Classification, the interview may be conducted by a Parole Board Member or a Parole Commissioner.

165. At the interview conducted by the institutional parole officer, information on the parole candidate is updated. Institutional parole officers add all minor and major disciplinary violations to the parole file since the last review. This interview serves as a tool to check the accuracy of these cases.

166. At the time of an interview with a parole officer or examiner, and before any Parole Board Member or Commissioner has an opportunity to see a

candidate's file, it is evident that a decision on the file has already been made. Overt acts evidencing a decision consist of the stamp "No Change" upon the file, meaning that the parole candidate is still not qualified for release. There are other overt acts evidencing a decision already rendered to deny parole such as little or no interest reflected in a candidate's parole plan or rehabilitation programs taken, and more interest shown in checking the accuracy of information already on file then adding new information since the last review.

### Parole Decision Making

167. The interview with an institutional parole officer is the only opportunity for most parole candidates to be heard. Institutional parole officers are not decision-makers. Given the Parole Board's meager human resources, it is physically impossible for these decision-makers to conduct a qualitative review of the number of files referred to them. Instead, the decision has already been made by Classification under secretive guidelines and formulas before the file even arrives at the Parole Board. In the preponderate bulk of cases, the Parole Board merely rubberstamps the decision of Classification, placing a patina of legitimacy upon an otherwise counterfeit decision.

168. Further evidence that the Parole Board only knows what Classification chooses to tell them can be deduced from the Parole Board decision itself. This consists of a computer generated form with codes

66

followed by conjunctive sentences. In each conjunctive sentence, there are numerous reasons listed for denying parole. Typically, no specific reason is noted, leaving the parole candidate to wonder which reason applies.

169. The Parole Board Decision does not indicate whether or how the Parole Board's Guidelines have been applied to each case. No reasoned decision has been given in support of their denial. Instead, the cryptic codes fundamentally denote three reasons; (1) the nature of their offense, and (2) prior criminal history and, if applicable, (3) recent disciplinary cases.

170. There is nothing in the Offender's Handbook, the Texas Government Code or the Texas Administrative Code which authorizes the denial of parole based upon the nature of the crime or prior criminal history. Only factors enumerated under the heading *Suitability Criteria for Parole* should apply.

171. In defending its decisions, the Parole Board steadfastly insists upon their right to exercise unfettered discretion with regard to granting or denying parole. The act of exercising discretion implicitly requires the act of discerning facts and, from these facts, forming a judgment. Parole Board decision-makers cannot possibly discern facts and make judgments when they never examine the underlying file. The entire argument of reserving their right to exercise discretion amounts to a fallacy, for it is a physical and mental impossibility for

17 parole decision-makers to discern facts and form judgments on this volume of cases; hence, the exercise of discretion never happened. Rather, this insistence upon exercising discretion is actually a post hoc rationalization for explaining a myriad of decisions which are in fact, indefensible.

172. In Texas, inmates have no right to appeal or challenge the denial of a parole in a Texas court. Texas courts have no authority to reverse a parole decision or to order the granting of a parole over the Parole Board's objection.

**Substituting a Parole Board Sentence for a Trial Court Sentence**

173. Among our three power centers of government, the administration of criminal justice is apportioned as follows. The Legislature has exclusive authority to define crimes and determine the sentence appropriate for each offense. The Judiciary has the exclusive authority to sentence a criminal defendant, and the judiciary's sentence is deemed final.[31] The Executive Branch has authority to implement the Judiciary's sentence.

174. When the jurisdiction of a court is defined in the Texas Constitution, it cannot be changed in any manner by the legislature, except where the power to do so is expressly conferred by the Constitution.[32]

---

[31] *See* Article 5, Sec. 5, Jurisdiction of Court of Criminal Appeals. (a) The Court of Criminal Appeals shall have final appellate jurisdiction coextensive with the limits of the state, and its determination shall be final in all criminal cases of whatever grade, with such exceptions and under such regulations as may be provided in this Constitution or as prescribed by law.
[32] *See* Ex Parte Towles, 48 Texas 413, at 439 (1878).

175. Just as the jurisdiction of a court defined in the Texas Constitution is permanent and cannot be changed by the legislature, the same applies to the Executive power center of government. There is nothing in either the Texas or the U.S. Constitution conferring a right upon these Defendants, members of the Executive Branch, to interpret and independently alter or modify a criminal sentence issued by the judiciary, or to substitute their judgment for the holding of a judge as to any of the sentencing terms.

176. The penological philosophy validating an indeterminate sentencing scheme shows no favoritism between the minimum and maximum sentence. Each sentence serves a purpose. The minimum sentence is there to reward an inmate that has addressed their anti-social conduct by taking programs and conforming to rules. The maximum sentence is reserved for the incorrigible inmate who refuses to conform and continues to exhibit anti-social conduct. By their conduct, inmates should gravitate to the sentence which best reflects their behavior. It is the Parole Board's job to sort out the inmates opting to change their anti-social behavior and reward them with a parole.

177. Eligibility for parole is part of the criminal sentence. When every trial court judge sets a maximum sentence, they are equally mindful of the minimum sentence. In every case, a trial court judge has implicitly found, and the Court's sentencing order fully contemplates, that the penological interests

69

of the State will be served if the criminal defendant is released at their first parole review. Further, orders of a trial court do not contemplate vain acts or empty formalities. At time of sentencing, the trial court sentence for all of these Plaintiffs took for granted the fact that they would receive serious release consideration at their first parole review, and for every succeeding review.

178. Since the Parole Board's decision-making has been subjugated to the business agenda of the Texas Department of Criminal Justice, and the Parole Board has been wholly reliant upon Classification for their knowledge of individual parole candidates, the trial court's minimum sentence has become both a vain act and an empty formality. The number of inmates getting serious release consideration at their first review is miniscule. When this does occur, it is typically because of an aggressive parole attorney somehow finding a way to overcome the standard operating procedure of these Defendants.

179. Upon becoming eligible for parole, every parole candidate is entitled to serious release consideration. This includes their initial parole review, and every succeeding parole review. Transforming an inmate's first parole review into an empty formality nullifies the trial court's minimum sentence and reduces this portion of the trial court order into a vain act.

180. There is a further consequence to nullifying the minimum sentence. These Defendants view the maximum sentence as if it were the only

sentence. Treating and therefore implementing the trial court sentence as if only the maximum sentence applied constitutes such a material modification to the judgment as to amount to a resentencing of the criminal defendant.

181. When the 70th Legislature created a new category of offenses called 3(g) crimes, the list included the use of a deadly weapon in the commission of a felony. If an inmate's crime included the use of a deadly weapon, they had to serve the first quarter of their maximum sentence day for day before qualifying for parole consideration. The 73rd Legislature amended this statute. Presently, if a deadly weapon has been used in the commission of a crime, the calendar time equaling ½ of the maximum sentence must be served before qualifying for parole consideration.

182. Because of the heavy penalty attached to the presence of a deadly weapon, this finding is frequently the crux of a plea bargain. Criminal defendants agree to a plea only when this finding gets dropped. In other cases, the presence of a non-lethal weapon gets inflated by prosecutors for leverage, a tactic known as over indicting. Prosecutors know that a deadly weapon could never be proven at trial. Nevertheless, just the specter of a deadly weapon and the prospect of having to serve ¼ or ½ of the maximum sentence day for day, becomes enough to persuade some criminal defendants into taking a plea for a dismissal of this finding. For a myriad of different reasons, the finding of a

deadly weapon can surface initially, then disappear in the court's final decree.

183. When Classification compiles its *general offense character* for a parole candidate, they look for references to a deadly weapon in the indictment, a prior arrest, a pre-sentencing report or in the evidence. Even objects not normally viewed as a deadly weapon, such as a small pocket knife or a weapon of non-lethal force, become inflated to fit this definition. Classification will seize upon any pretense available, in some cases even fabricating a deadly weapon, so as to color the offender's crime as aggravated.

184. When a deadly weapon is introduced, Classification always characterizes the weapon as being brandished or used. Once the brandishing or the use of a deadly weapon is added to the *general offense character*, the crime qualifies as aggravated, and the penalties attached for a 3(g) crime can be applied. In all of these cases, Classification is substituting its judgment for the findings of a trial court.

185. Furthermore, Classification never checks to see if the crime was committed during the term of the 70th Legislature or the 73rd Legislature. In all cases, Classification applies the harsher rule invoked by the 73rd Legislature, and makes the inmate serve ½ of their calendar sentence before becoming eligible for parole.

186. The act of characterizing a crime as a 3(g) offense, without any

support for doing so in the trial court order, has the further consequence of disqualifying an inmate for their Mandatory Supervision Date, and it renders meaningless their Good Time and Work Credits. As a consequence, the trial court's judgment is being modified in two further respects. While the trial court order contemplated a Mandatory Supervision Date and the meaningful accumulation of Good Time and Work Credits, the actions of Classification have reversed these implicit terms and caused them to be deleted.

187. In the manner just described for a deadly weapon, Classification will seize upon any pretense, such as an indictment for aggravated kidnapping which eventually becomes a conviction for a lesser included crime, and apply the following modus operandi, although not necessarily in this order. (1) The 3(g) crime or the crime disqualifying an inmate for a Mandatory Supervision Date will be incorporated into its *general offense character* assessment. (2) Classification will paint the inmate's current crime as constituting either a 3(g) offense or a crime disqualifying them for a Mandatory Supervision Date. (3) The punishment attached to the 3(g) offense or the crime disqualifying the inmate for a Mandatory Supervision Date will be applied, even though there is no support in the trial court judgment for doing so.

188. The net result will be to modify the trial court judgment as follows. Where the trial court judgment contemplated the prospect of a Mandatory

Supervision Date, these overt acts will delete this term from the sentence. Where the trial court judgment contemplated the accrual of meaningful Good Time and Work Credit, permitting an accelerated initial parole review, the engagement by Classification of a 3(g) crime will render Good Time and Work Credit meaningless and postpone the first review until half the calendar time has been served. In both cases, clerks and administrators in Classification are substituting their judgment for the judgment of a trial court.

189. If an offender commits a second crime and the journal entry is silent as to whether this current sentence is to run concurrent or consecutive to a still outstanding prior sentence, the presumption is that they run concurrent.

190. Classification has a practice of aggregating these sentences. *Aggregating sentences* means to join prior and current sentences together into a common lump sum and effectively make them run consecutive, even though there is nothing in the trial court judgment to support this finding. This practice and custom of aggregating sentences amends the trial court order by adding a new term – namely that the new sentence does not begin to run until the prior sentence has been fully served. This practice and custom has the further consequence of extending the expiration date of the current crime by the amount of time required for fully serving and therefore discharging the prior sentence.

74

191. When a technical parole violator returns to prison, they are being punished for violating the terms of their parole. More importantly, a technical parole violator has not been found guilty of committing a new crime.

192. Parole Board field officers, possibly acting with the assistance and cooperation of Classification and other Texas Department of Criminal Justice departments and divisions, will seize upon facts which have never been proven in court and, after considering core questions of guilt or innocence, come to their own independent determination that the technical parole violator has committed a new crime.

193. Without any of the protections afforded by either the Texas or the U.S. Constitution, these Defendants will serve as prosecutor, judge and jury, and perfunctorily issue a punitive prison sentence, defined as any prison sentence that is over a year in duration and therefore not remedial.

194. In executing this new prison sentence, these Defendants will appropriate for their use a portion of the sentence originally issued by the trial court for the offender's latest crime. This overt act occurs without taking the offender back to the courtroom. As a result of these overt acts, an offender begins serving a new prison sentence for criminal conduct that has never been proven or acknowledged in the trial court.

195. This list of machinations and subtle perversions utilized by these

Defendants for accomplishing or furthering the goal of substituting a Parole Board sentence for a trial court sentence is illustrative and not exhaustive. As discovery unfolds, Plaintiffs expect to find additional ways in which the terms of a trial court judgment are being nullified, amended, modified or overruled. Defendants pursue a philosophy of preserving the portion of the sentence which they like, while aggressively looking for ways to alter any of the terms in a sentence which benefit inmates. Plaintiffs hereby place Defendants on notice that any and all such acts which have as their net effect, the nullifying, amending, altering or overruling of a term, either explicit or implicit, in a trial court judgment is hereby incorporated by reference as if it were pled here.

196. While many of the overt acts described herein are committed by the Classification division of the Texas Department of Criminal Justice, all of these overt acts are performed under the auspices of the Parole Board's authority. By placing of patina of legitimacy upon this counterfeit and illicit activity, the Parole Board is equally culpable and responsible for this conduct.

### Parole Releases

197. When an inmate is granted a parole, they are given a release date. Just prior to the arrival of this release date, male inmates travel to the Walls unit in Huntsville where they are processed out of the T.D.C.J. system. Female inmates travel to the Gatesville reception center.

198. As part of this processing procedure, paroled inmates are expected to sign an agreement which states that they are voluntarily relinquishing all of their good time and work credit. Inmates are told that if they do not sign this agreement and voluntarily relinquish their good time and work credit time, their parole may be revoked. Under duress, inmates sign this agreement.

199. The relinquishment of good time and work credit substantially extends their period of supervision. Texas requires an inmate to serve their entire maximum sentence either in prison or on parole. Liberal good time and work credits make every flat day equal to 2 ½ days, and this additional time brings them significantly closer to the end of their sentence. When an inmate releases good time and work credits upon being paroled, the remaining amount of time to be served is instantly extended by the measure of this good time and work credits. If an inmate loses 7 years of good time and work credit, they will have to serve these 7 years day for day on parole. A maximum sentence becomes satisfied only to the extent fulfilled by their flat time.

### Parole Revocation

200. While an inmate is released on parole, flat time, also termed *street time*, continues to accrue toward satisfaction of their maximum sentence. When an inmate's street time, coupled with their time served in custody, equals their maximum sentence, they are discharged from their crime.

201. If an inmate is accused of committing a parole violation, Defendants do not require a show of probable cause before issuing an arrest warrant. Instead, police officers execute the arrest warrant and return the parolee to either jail (i.e. county prison) or to a state institution (i.e. T.D.C.J.)

202. After an inmate has been arrested and returned to jail or T.D.C.J., Defendants are required to convene a revocation hearing within 19 days,[33] where evidence used in support of the arrest warrant is reviewed for a finding of good cause to revoke parole. Defendants do not adhere to this time limit and they do not convene these revocation hearings in a timely manner. As a result, a person can languish in a county jail or in a state prison for a year or longer, awaiting their revocation hearing.

203. When a revocation hearing is convened, a neutral and independent decision-maker is supposed to review the evidence and determine whether or not there is good cause to revoke parole and return the inmate to prison.

204. The long lapse in time between an arrest and a revocation hearing has the insidious effect of creating a substantial incentive for the decision-maker to justify this extended detention by finding the evidence persuasive in support of the arrest. Any contrary decision could leave them exposed to civil liability for an extended period of wrongful incarceration. In this manner and

---

[33] Defendants are to interview the parolee within five days and conduct a revocation hearing no later than 14 days after this interview.

for this reason, Plaintiffs are denied a meaningful revocation hearing convened before a neutral and objective decision-maker.

205. The delay in time between an arrest and a revocation hearing has the further consequence of causing redeeming and mitigating evidence in support of the parolee to become stale or unavailable, while evidence tendered initially becomes unduly enhanced simply because it is available. This bias occurs despite the fact that this evidence might not be trustworthy (i.e. it consists of unsworn and uncorroborated statements of interested third parties).

206. As a result, the paroles of many Plaintiffs are unjustly violated and they are returned to prison without good cause as technical parole violators.

207. When a Texas inmate returns to prison after a revocation hearing, they lose their accrued street time if the time spent outside prison is less then the amount of time served in prison. For parolees that have not served time on the street equal or greater than their time of incarceration, this street time is taken away from them and a year is added to their maximum discharge date. These actions have the effect of extending their sentence and simultaneously moving their expiration date backward by the amount of street time lost plus this additional year. This extension to their sentence occurs without returning the offender to the trial court and without any approving journal entry from the sentencing judge.

208. Once an inmate has been returned to prison for a parole violation, they occupy the same status as an offender serving time for their crime. These Plaintiffs are subject to paper reviews (i.e. a hollow formality in lieu of a serious parole consideration) and to set-offs, with the latter now running two, three, four or five years.

209. Often, the reason given in a parole denial is *nature of the crime*, even though they are not serving time for a crime, but for a parole violation.

210. Because of the use of N.C.I.C. codes, the Parole Board's guidelines cannot be applied to a technical parole violator.

211. Plaintiffs are serving time for multiple set-offs exceeding five and ten years for parole violations. While nominally subject to the Parole Board's authority, the fate of these inmates is truly under the control of clerks and administrators in Classification. For parole violators, their ordeal is the functional equivalent to serving time for their original crime a second time, or for an uncharged new offense constituting a Parole Board conviction.

## Prejudicial Overt Acts

212. On November 7, 1989, Texas voters approved an amendment to the Texas Constitution which combined all state agencies dealing with criminal justice into one giant department, the Texas Department of Criminal Justice. As construed by these Defendants, this mandate was translated into a

reorganization of the Texas Parole Board, whereby the Parole Board was separated from its support staff, but continued to be held accountable for deciding the fates of all parole candidates. The overt act of separating the Parole Board from its staff, but continuing to hold the Parole Board responsible for deciding all parole reviews, constitutes a prejudicial overt act, because the enormity of the responsibility saddled upon the Parole Board is clearly impossible to perform with its given resources and personnel.

213. During the term of the 74th Legislature from 1995 to 1997, the shift of the Parole Board's staff into T.D.C.J. was complete, and it was obvious that the Parole Board lacked the resources to carry out its existing duties and responsibilities. Nevertheless, the 74th Legislature *increased* the Parole Board's authority by allowing the Parole Board, for the first time, to take away an inmate's good time and work credits and hold them for every calendar day of their sentence, simply by finding that the inmate's release posed a danger to the public. The burden imposed by this additional inquiry and finding that an inmate posed a danger to the public was clearly beyond the Parole Board's capacity to perform. Giving the Parole Board additional authority when they lacked the resources to do their assigned job constitutes a prejudicial overt act.

214. On January 18, 2001, the Parole Board adopted guidelines promulgated by an outside consultant firm. The act of adopting these

81

guidelines constitutes a prejudicial overt act, because these guidelines give parole candidates no guidance as to how much time must be served for their crimes, or when they can reasonably expect to be paroled. In short, these guidelines are illusory; they do not perform the function typically performed and customarily expected of governmental guidelines.

215. It is a prejudicial overt act to memorialize a parole decision with only a computer generated form consisting of codes, followed by conjunctive sentences listing eight or more independent reasons for engaging this code, without specifying which of these conjunctive sentences apply.

216. It is a prejudicial overt act to deny parole based upon unchanging factors, such as the nature of the crime and / or prior criminal history.

217. In the course of formulating a general offense character score for inmates, Classification seeks to categorize inmates into one of six categories: (1) Violent Aggravated Non-sexual, (2) Violent Aggravated Sexual, (3) Non-aggravated Sexual, (4) Non-violent, (5) Violent Non-Aggravated Non-sexual, and (6) Unclassified. The judgment of a trial court should dictate an inmate's placement in one of these categories. The act of assigning an inmate to one of these six categories becomes a prejudicial overt act when Classification substitutes its judgment for the judgment of a trial court and assigns an inmate to a category other than the one dictated by the trial court judgment.

218. It is a prejudicial overt act on the part of Classification to apply formulas applicable to hardened, predatory criminals guilty of committing horrific crimes, to first time offenders, offenders committing situational crimes and to offenders driven by drug induced vices.

## Material Omissions, Moral Turpitude and Misrepresentations

219. Placing the Board of Pardons and Paroles outside the Texas Department of Criminal Justice maintains the appearance of autonomy and independence. In reality, the Parole Board has a parasitic dependency upon the Texas Department of Criminal Justice in general and the Classification and Records division specifically. Failing to disclose and acknowledge the full extent of this dependency constitutes a material omission. Promoting the impression of an autonomous and independent Parole Board is an act of moral turpitude, because this representation is false and Defendants know it is false.

220. It is a material omission to have guideline ranges missing from squares inside the Parole Board's current parole guidelines matrix chart. The entering of parole probabilities in place of guideline ranges constitutes an act of moral turpitude, because parole probabilities are not the functional equivalent to a guideline range. Defendants are well aware of this difference.

221. The Classification division is quietly applying formulas and unwritten guidelines to individual inmate cases. It is a material omission to

refuse to disclose these formulas and unwritten guidelines to Plaintiffs. It is an act of moral turpitude to offer the Security Response Technology measuring instrument as the yardstick for judging all parole candidates, when Defendants are actually using secret formulas to dictate the fates of parole candidates.

222. It is a material omission to be using N.C.I.C. codes instead of Texas Penal Code sections for the assigned severity rating in the Parole Board's current guidelines. Plaintiffs have all been convicted of crimes under the laws of Texas. Finding their crime for the severity rating should not be a secret or a mystery to be solved. It should be lifted directly from their court judgment.

223. It is a material omission to refuse to reveal how the current parole guidelines have been applied to every parole candidates' case. If these guidelines have not been applied, it is a further material omission as well as a material misrepresentation to hold out these guidelines as satisfying the legislature's mandate to adopt and apply guidelines,[34] while simultaneously refusing or neglecting to apply them and not admitting it. Collectively, these material omissions and material representations also constitute conduct reflecting moral turpitude.

224. In formulating its general offense character score for every inmate,

---

[34] *See* V.T.C.A., Government Code § 508.144 (a).

it is a material omission when Classification does not include mitigating and positive reports attesting to an inmate's efforts to assume responsibility. The resulting profile is highly biased and prejudicial to a candidate's chances for earning a parole. Presenting a partial portrait of a parole candidate and passing this off as a complete picture further constitutes a material misrepresentation.

225. In calculating the severity rating for an inmate's placement within the matrix grid of the guidelines, the failure to stipulate that this severity rating must be based upon and mirror the offense of conviction constitutes a material omission. The resulting crime profiled in the severity rating may not match the offense of conviction. Presenting a crime that does not match the offense of conviction, and passing this off as the current crime, constitutes a material misrepresentation as well as an act of deception. Collectively, this material omission, material representation and act of deception also constitute conduct reflecting moral turpitude.

226. It is a material omission to inform an inmate that their parole has been denied, without providing a reasoned decision to support this result.

## Guilty Knowledge

227. Defendants are aware of the magnitude of work generated by screening over 164,000 inmate files to locate the roughly 78,000 cases requiring attention, the time entailed with applying the current parole

guidelines to all parole reviews, and the analysis which must be undertaken to determine whether these inmates satisfy the suitability criteria for releases. With only 17 parole decision-makers, backed up with only a skeletal staff, it is evident and foreseeable that the task exceeds the Parole Board's resources. Decisions issued under the Parole Board's authority are actually decided by T.D.C.J. bureaucrats, using criteria such as *unchanging factors* which are not even supposed to be considered at a parole review.  Defendants know that decisions issued under the authority of the Parole Board constitute a sham and an exercise of deceit. In addition to reflecting guilty knowledge, this conduct is also infused with moral obliquity and moral turpitude.

228. The finding required by the 74th Legislature, that an offender's good time and work credits can be taken away upon a finding that the offender's release constituted a danger to the public's safety, constitutes a vague and ambiguous standard, which makes it vulnerable to abuse. Furthermore, these Defendants are fully aware of the Parole Board's lack of resources to inquire and document such a finding. Despite this knowledge and these known limitations, Defendants invoke this justification – an offender's release constituted a danger to the public – without any factual basis or reasoned decision to support their position, and despite considerable evidence pointing to a contrary conclusion. In so doing, Defendants are knowingly

abusing this standard and causing tens of thousands of Plaintiffs to miss their Discretionary Mandatory Supervision date and lose the benefit of their acquired good time and work credit due to false and / or unproven pretenses. This conduct reflects guilty knowledge as well as moral turpitude.

229. Defendants know that the Security Response Technology instrument employed as their current parole guidelines constitutes a sham. Defendants are aware that these guidelines are fatally flawed in that they do not serve the fundamental purpose implicit in any guideline, which is to protect individuals subject to a governmental regime from arbitrary and capricious decision-making by structuring and restricting their exercise of discretion. The chief virtue served by these guidelines from Defendants' perspective constitutes the fact that they *do not* burden their exercise of discretion. This lack of structure and the license to use unbridled discretion has cultivated an operating climate and a belief system which has legitimized the rendering of decisions in an arbitrary and capricious manner. Defendants know this, but continue to represent these guidelines to the Legislature as credible and legitimate rules.

230. When asked to justify a parole decision, the Parole Board has a standard teflon-like response versatile enough to field any challenge, namely that the decision is a product of the Parole Board's exercise of discretion.

These Defendants know that discretion has never been exercised by the Parole Board and, in all likelihood, by anyone in T.D.C.J. Rather, the decision has been dictated by formulas which, once applied, dictate these results. It is a manifestation of moral obliquity and moral turpitude to use the exercise of discretion as an evasion technique for the purpose of camouflaging acts which, if open for inspection, Defendants know would be considered contemptible.

231. Defendants invoke their exercise of discretion as both a shield and a sword, serving both offensive and defensive strategies. Simultaneously, Defendants suppress the true robot process prompting parole decisions. Use of the *exercise of discretion* mantra is in reality a post hoc rationalization which serves but one purpose. A cloak of legitimacy is being summoned to conceal a counterfeit and illegitimate decision-making model fueled by business considerations and capacity concerns, while totally ignoring the factual findings required by statutes and administrative rules.

## Federal Claims

### Claim 1 – Violation of the Separation of Powers

232. Paragraphs 1 through 231 are hereby incorporated by reference and inserted into this claim, as if each paragraph was fully printed here.

233. Article 5, § 5A of the Texas Constitution states the determination of guilt in a criminal matter and the sentencing of a criminal defendant are the

exclusive province of the Court of Criminal Appeals, a part of the Judiciary.

234. With the exception of cases punishable by death and where the sentence is explicitly Life without parole, every Texas inmate is eligible for parole. While granting a parole is a privilege, Texas has a comprehensive statutory scheme for qualifying and considering the suitability of parole applicants as well as the merits of mandatory supervision candidates.

235. The words and phrases of any statute bearing upon parole or Discretionary Mandatory Supervision must be construed in harmony with the rules of grammar and given a plain reading of its terms, according to their common, everyday usage. Under the Code Construction Act, the entire statute is intended to be effective.[35] Conversely, it is an impropriety to add any term or impute any meaning to a code provision that is not apparent from a facial examination of the law. Implicit in every Act of the Legislature is the premise that none of these statutes are to be openly challenged and disobeyed, compromised by illusory counterfeit rules, trivialized through hollow formalities or converted into vain acts.

236. There is nothing in the Texas Government Code or the Texas Administrative Code granting the Parole Board the right to delegate its decision-making and its assigned statutory responsibility to any other agency,

---

[35] V.T.C.A., Government Code § 311.02.

and particularly not to the Texas Department of Criminal Justice. [36]

237. Upon integrating the central staff of the Parole Board into the Texas Department of Criminal Justice, the Parole Board lost its ability to screen the 164,000 inmates subject to its authority and to analyze each of the estimated 78,000 cases warranting review each year. By default, Parole Board decision-making and its assigned statutory responsibility has been delegated to and absorbed by the Texas Department of Criminal Justice, acting through its Classification division. Given the hierarchal structure of authority prevalent in any government agency, parole decision-making has now been subjugated to the business agenda of the Texas Department of Criminal Justice.

238. Since this transition occurred, these Defendants have propped up the Parole Board as an independent fourth branch of government, operating totally outside democratic and judicial processes, serving as a mini-judiciary over any citizen in custody or under supervision – which in Texas translates into one out of twenty residents – where commission of the current crime can be used over and over, *ad nausea,* to justify the issuing of new set-offs and blocking release.

239. Under the current regime of delegated authority, these Defendants have usurped every other significant participant in the criminal justice system.

---

[36] *See* V.T.C.A., Government Code § 508.0441 Release and Revocation Duties.

240. Violating the Separation of Powers Doctrine qualifies as a constitutional violation in satisfaction of the Prison Litigation Reform Act of 1996.[37] When evidence indicates the Parole Board violated the U.S. Constitution, the matter may be reviewed by a Federal court pursuant to §1983.

**(a) Usurping the Legislature's Authority**

241. Through prejudicial overt acts, material omissions, material misrepresentations and acts of deceit, compounded by guilty knowledge, these Defendants have openly challenged and disobeyed the statute enacted in the 71st Legislature stipulating how an offender with consecutive sentences was entitled to parole eligibility once credit had been earned on all sentences and eligibility for parole had been attained on the last sentence.

242. Through prejudicial overt acts, material omissions, material misrepresentations and acts of deceit, compounded by guilty knowledge, these Defendants have compromised the Legislature's mandate to implement and apply parole guidelines.[38] Although guidelines have been adopted, they are a sham. The parole guidelines adopted by the Parole Board provide no guidance, interject no structure upon the exercise of discretion and indulge the very evils that guidelines are supposed to prevent.

---

[37] Pub. L. No. 104-134, 110 Stat. 1321
[38] *See* V.T.C.A. Government Code § 508.144

91

243. Through prejudicial overt acts, material omissions, material misrepresentations and acts of deceit, compounded by guilty knowledge, these Defendants have trivialized the suitability criteria[39] for qualifying for parole. Defendants have adopted, without any legal or constitutional authority for doing so, an alternative suitability criteria consisting of unchanging factors, while treating the suitability criteria of the legislature as inferior and unworthy.

244. Through prejudicial overt acts, material omissions, material misrepresentations and acts of deceit, compounded by guilty knowledge, these Defendants have converted the initial parole hearing mandated by operation of law after serving ¼ of the sentence into a hollow formality and a vain act.[40]

245. Defendants are usurping the authority of the Legislature by adopting counterfeit parole guidelines, which are represented to elected representatives as credible. Defendants are further usurping the authority of the legislature by applying laws retroactively, when it is evident in the legislation that these laws were only to be applied prospectively.

246. Defendants are abusing the trust embedded in several Acts of the Legislature. For example, in the Discretionary Mandatory Supervision law of the 74th Legislature, the Parole Board was only to hold the occasional inmate

_____

[39] *See* V.T.C.A., Government Code § 508.141(d), (e)(1), § 508.145, 37 Texas Admin. Code § 145.3(3).
[40] *See* V.T.C.A., Government Code § 508.145 (f).

beyond their Mandatory Supervision Date, and then only upon a finding that they posed a danger to the public. The element of trust incorporated into this grant of authority consists of the finality attached to the Parole Board's finding. Decisions rendered by Parole Board Defendants are not subject to administrative or judicial review. [41] T.D.C.J. Defendants, acting through the auspices of the Parole Board, have taken this surgical grant of authority and applied it to class members in a wholesale fashion, disqualifying thousands of inmates for their Discretionary Mandatory Supervision date with no factual basis or any reasoned decision to support their position, and often in conflict with a plethora of evidence demonstrating that the inmate does not pose any danger to the public.

247. T.D.C.J. Defendants are openly defying the Legislature on the computation of a consecutive sentence. By statute, Defendants are to qualify an inmate with consecutive sentences for parole after they served sufficient time on each sentence to become eligible for parole, one after another. Upon reaching parole eligibility for the last sentence, these offenders were eligible for release on parole.[42] Defendants issued an Administrative Directive [43] stipulating that consecutive sentences are to be aggregated, meaning they are

---

[41] *See* V.T.C.A., Government Code § 508.149 (d).
[42] V.T.C.A. Government Code, § 508.150.
[43] T.D.C.J. Administrative Directive, # AD-04.37, dated September 5, 1997

to be joined. This Administrative Directive defies the statute by creating one very long single sentence. Offenders do not begin to serve their next sentence until the prior sentence "ceases to operate."

248. The above examples of usurpation of authority from the Legislature are illustrative and not exhaustive. As discovery unfolds, we anticipate finding additional instances of usurpation of authority. Plaintiffs hereby place Defendants on notice that any and all such acts or practices which have as their net effect, the usurpation of authority from the Legislature, either explicitly or implicitly, are hereby incorporated by reference as if it were pled here.

**(b) Usurpation of the Judiciary's Authority**

249. When Defendants are unsatisfied with a court conviction, they become self appointed prosecutors, jurors and judges; proceed to consider core questions of guilt or innocence; followed by findings of fact and / or conclusions of law which cannot be reconciled with the trial court's decision. In this manner, through the exercise of decision-making which is functionally equivalent to a judge, Defendants are usurping the Judiciary's authority.

250. Instead of receiving serious release consideration at their first parole hearing, Plaintiffs receive a new sentence dictated by the Texas Department of Criminal Justice, but formally issued under the auspices of the

Parole Board's authority. Defendants begin by treating the minimum sentence as if it did not exist, and look at the maximum sentence as if it were the only sentence. Next, secret formulas and unwritten guidelines are applied. These formulas and unwritten guidelines overrule and supersede judicially sanctioned plea agreements and evidence of rehabilitation. Finally, the offender is given a *general offense character* score or assessment built totally upon factors which cannot change, and this profile is used and periodically refreshed so as to justify the prolonged amount of time being served.

251.    There is nothing in the Texas Government Code, the Texas Administrative Code or the Offender's Handbook permitting the Parole Board to use its license to grant or deny paroles for any purpose, other than to apply the suitability criteria set forth in these legal texts and to render a decision on an offender's fitness to return to society, or to judge whether an inmate eligible for discretionary mandatory supervision poses any danger to the public.

252.    Defendants have no authority to hold an offender beyond their maximum sentence. Class members with convictions subject to the 65th Legislature have served a Life sentence when their flat time, Good Time and Program Credits equal 60 years. Class members have served this amount of time, but Defendants persist in holding them. In addition, Defendants have rendered their own independent interpretation of trial court orders for multiple

crimes. Although the trial court has ordered these sentences to be served concurrently, Defendants have amended this sentence to require the sentences to run consecutively. Modifying a court's order in this manner also causes a class member to serve beyond the expiration date of their longest sentence.

253. Defendants have no authority to conduct their own independent appraisal of a trial court sentence and, after considering core questions of guilt or innocence, promulgate a *general offense character* score or assessment which varies in any manner with a judge's order. Decision-making of this kind is judicial in nature, and reserved exclusively to members of the judiciary.

254. As an example of this practice, Defendants will type a person as violent, even though there is nothing in their current offense to warrant this label, by looking to a prior offense, even though the prior offense has already been discharged.

255. Defendants will amend the sentence of a class member convicted of murder, from Life with eligibility for parole into simply Life.

256. Defendants will seize upon any object involved in a crime as a deadly weapon, a 3(g) offense, even though that object is not considered under the Vernon's Texas Annotated Code as a deadly weapon and the object is not listed as an affirmative finding on the trial court judgment. Nevertheless, Classification will list these offenders as violent.

96

257. The substitution of a *general offense character* score or assessment for any term or condition in a trial court judgment constitutes a usurpation of judicial authority. Similarly, the nullification of any term or condition in the trial court sentence, whether done overtly, circuitously or through indifference, constitutes usurpation of judicial authority. For Defendants, the exercise of this authority is *ultra vires* (i.e. beyond their authority).

258. These appalling judgments are rendered by faceless clerks and administrators, applying formulas predicated upon secret and unknown criteria. This decision-making proceeds under the guise of exercising Parole Board discretion. In due course, these counterfeit decisions are memorialized by a computer generated form with codes, followed by numerous conjunctive sentences, giving the parole candidate no factual basis or reasoned decision to support the result. Indeed, the computer generated form does not even specify which part of the conjunctive sentence applies to their case.

259. The above examples of usurpation of authority from the Judiciary are illustrative and not exhaustive. As discovery unfolds, we anticipate finding additional instances of usurpation of authority. Plaintiffs hereby place Defendants on notice that any and all such acts or practices which have as their net effect, the usurpation of authority from the Judiciary, either explicitly or implicitly, are hereby incorporated by reference as if they were pled here.

**(c) V.T.C.A. Government Code, § 508.156 (e) [Previously Tex. Code Crim. Proc. Ann. Art. 42.12 § 22 (Vernon 1979)]**

260. Defendants have incorporated the following term into every Mandatory Supervision Certificate, in bold type and capital letters.

BE IT FURTHER KNOWN THAT ANY VIOLATION OF SUCH RULES OR CONDITIONS SHALL BE SUFFICIENT CAUSE FOR REVOCATION OF THIS MANDATORY SUPERVISION, AND THAT ALL TIME SERVED ON MANDATORY SUPERVISION SHALL BE FORFEITED.

261. The term quoted above has been expressly authorized by the Legislature [i.e. § 508.156 (e)], whose statute reads in pertinent part;

"If a parole panel revokes the person's parole, the panel may require the person to serve the remaining portion of the person's sentence in the institutional division. The remaining portion of the person's sentence is computed without credit for the time from the date of the person's release to the date of the revocation. …"

262. It is a bedrock constitutional principle of this country that there must be an independent judiciary. In Marbury v. Madison, [44] the view was rejected that an Article III U.S. Court must defer to the legislature's interpretation of the Constitution. This rule applies with equal force to an Article 5 Texas court.

263. The constitutionally created power to render judgment on matters

---

[44] 5 U.S. (1 Cranch.) 137, 174-176 (1803).

within a court's jurisdiction necessarily includes the power to effectuate that judgment. Every class member has been the subject of a judicial decree. In every one of these judicial decrees, there is a prison sentence, and part of this prison sentence includes the date when the sentence expires. Simultaneously, the court's jurisdiction also expires with termination of the prison sentence.

264. The captioned statute of the legislature stipulates that if a parole is revoked, the credit received for serving time outside of prison becomes forfeit. This statement refers to the calendar time served between release on parole and the revocation of this parole. Implicit in this statement is the authority of these Defendants to first grant credit toward service on a prison sentence, and then cancel this credit for calendar time served outside of prison.

265. The prison sentence served by these class members was issued by a trial court. The Executive Branch has no authority to interpret or alter a clear and unambiguous term in a court decree, and there is nothing ambiguous or unclear about an order to serve a maximum sentence of fifteen years, or for any other number of years reduced to writing by the trial court.

266. All trial court orders contemplate serving a sentence continuously, not in segments. In support of this position, trial court orders stipulate a beginning point and an ending date.

267. There is a further reason for delineating a beginning and an end to

a prison sentence. The power of the trial court rests upon jurisdiction. This jurisdiction is conferred by statute. The delineating of a beginning and an ending of a trial court sentence insures that the court's ruling conforms to the limitations of a governing statute.

268. Upon issuing its trial court sentence, the expiration date of the prison sentence doubles as the distant parameter for the court's jurisdiction. Beyond this date, the trial court's authority lapses along with Defendants' authority to hold an inmate in prison pursuant to a trial court order.

269. Defendants, acting under authority of this statute, revoke credit for the time served between release on parole and the revocation of parole. This overt act deprives the class member of the calendar time accrued while on parole. As its natural consequence, the calendar time deleted gets added to the end of the prison sentence; and the trial court's original expiration date for the sentence gets *extended into the future* by the amount of time accrued between release on parole and the revocation of this parole.

270. Neither the Legislature nor these Defendants have any authority to incarcerate any class members. This power is reserved exclusively to the judiciary.

271. Neither the Legislature nor these Defendants have authority to stop and start the running of a trial court sentence. Neither the Legislature nor these

Defendants have authority to delete calendar time accrued toward satisfying a prison sentence, and to declare this segment of calendar time as forfeit.

272. Granting either the Legislature or the Executive Branch the liberty to *extend* the expiration date of the trial court's order *into the future* constitutes an extension of the trial court's jurisdiction ostensibly upon the Legislature's authority. If indulged, this would become manifested in a period of incarceration legitimized and sanctioned *by the Legislature*. This grant of authority seriously encroaches upon the Judiciary's exclusive domain to sentence criminal defendants and protrudes well beyond the permissible boundary contemplated by the Separation of Powers Doctrine.

273. Granting either the Legislature or the Executive Branch the authority to change a sentence from running continuously into a sentence which runs and stops, and where calendar time already served can be deleted and added to the end of the sentence, ostensibly imbues the Legislature and Executive Branches with authority to overrule what is arguably the most important single term of the judicial decree, the manner in which a prison sentence is to be served. This grant of authority would have as its effect, the diminution of a trial court order into an advisory opinion, a condition deemed anathema under both the Texas and U.S. Constitution, which hold that a trial court order is definitive.

274. Once a class member reaches the expiration date of their trial court sentence, after a portion of their calendar time has been deleted pursuant to the authority of Government Code § 508.156 (e), the continuing incarceration of this class member is *ultra vires*, because the jurisdiction of the trial court has lapsed, causing its lawful authority to order incarceration to expire. Class members engaging these facts are being unlawfully incarcerated.

275. The example of Government Code § 508.156 (e) is illustrative and not exhaustive. If during discovery, Plaintiffs uncover additional statutes encroaching upon the Judiciary's exclusively reserved domain of sentencing class members, Defendants are hereby placed on notice that all such statutes are hereby incorporated by reference as if they were pled here.

## Claim 2 – Double Jeopardy

276. Paragraphs 1 through 272 are hereby incorporated by reference and inserted into this claim, as if each paragraph was fully printed here.

277. The Fifth Amendment of the U.S. Constitution states, in pertinent part: "… nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb…" This clause assures three basic protections. It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. Finally, it protects against multiple punishments for the same offense.

278. Violating the Double Jeopardy Clause qualifies as a constitutional violation in satisfaction of the Prison Litigation Reform Act of 1996.[45] When evidence indicates the Parole Board has violated the U.S. Constitution, the matter may be reviewed by a Federal court pursuant to §1983.

**(a) Second Prosecutions for the Same Offense after Acquittal**

279. The Legislature has given Parole Board Defendants the authority to revoke parole. Reasons for revoking parole broadly fall within two categories. (1) A class member's parole will be revoked if they commit a new crime. (2) Parole will be revoked if the class member violates a condition of their Mandatory Supervision Certificate.

280. While most cases involving the revoking of parole fall neatly into one of these categories, there is a third, hybrid category. A class member can be accused, while free on parole, of committing a new crime. The class member steadfastly proclaims their innocence and takes the case to a jury trial.

281. At trial, the jury finds for the defendant and the class member is acquitted. Parole Board Defendants still retain jurisdiction to determine whether or not a parole violation has occurred. Relying upon the identical facts set forth by the prosecution at trial, Parole Board Defendants proclaim the class member to be in violation of their Mandatory Supervision agreement at a

---

[45] Pub. L. No. 104-134, 110 Stat. 1321

parole revocation hearing. After revoking parole, the class member is returned to prison. Despite a reason for revoking parole which appears to be a new felony, this class member has not committed any new crimes. The status of this class member is that of a technical parole violator.

282. Under these facts, Defendants can lawfully hold a class member for a remedial amount of time, typically defined as up to a year. Parole guidelines presently contain no mechanism to evaluate technical parole violators.

283. Lacking any ability to analyze these facts within a technical parole violator context, Defendants are holding class members for terms equivalent to the years that a judge or a jury could have set, if they had been found guilty.

284. In this manner and under these facts, decisions rendered by these Defendants for technical parole violators are functionally equivalent to an Article 5 Texas court. Defendants are acting as prosecutors, jurors and judge. After considering core questions of guilt or innocence, Defendants declare class members guilty of the same crime for which they have been acquitted by a jury. Parole Board panels typically issue set-offs in increments of one or two years, although they are increasingly being issued for three years. As class members qualify for parole consideration, they are getting denied just as if they committed a crime. When the years of accumulating set-offs become

commensurate to the time that could have been declared by a judge or a jury, the class member's rights under the Fifth Amendment have been violated, for they are being prosecuted again for the same crime after they were acquitted.

285. The practice just described further entails appropriating the remnant of a class member's original sentence, and converting this remnant into a new sentence for conduct never fathomed by the trial court. Appropriating and converting the unserved remnant of a prison sentence into a new prison sentence also constitutes an intrusion into the Judiciary's sphere of authority, and further violates the Separation of Powers Doctrine. When the trial judge issued this sentence, they contemplated applying that sentence to the crime proven in their court, and for no other felonies.

**(b) Second Prosecutions for the Same Offense after Conviction**

286. Named Plaintiff Jesse Dickson committed a crime in the 1970's. After serving a portion of this sentence, he was paroled. On parole, he committed a new crime in Arkansas on March 8, 1989. Mr. Dickson served seven years in an Arkansas prison for this crime. He was paroled at his initial eligibility hearing. However, because of a detainer issued by Texas, he was not set free. Instead, Mr. Dickson was returned to Texas.

287. Mr. Dickson's parole revocation hearing on March 18, 1997 lasted 17 minutes. At its conclusion, he was pronounced in violation of his parole.

The only basis for finding Mr. Dickson in violation consisted of his crime in Arkansas.

288. In 1997, Mr. Dickson was given a one year set-off. If he had been paroled at this hearing on July 27, 1998, the time-served would have been remedial and Defendants would have acted within their realm of authority.

289. Unfortunately, Mr. Dickson was denied parole in 1998 and given another one year set-off. The only reason given was *nature of the offense* and his parole violation, factors which he cannot change. In 1999, Mr. Dickson was again considered for parole. For the third time, he was denied and given a two year set-off. In 2001, he was denied parole for the fourth time and given another two year set-off. After serving his fourth set-off, he was denied parole in 2003 and given another one year set-off. At this juncture, his accumulated set-offs equaled seven years, which is the amount of time considered appropriate by Arkansas where the crime took place. In 2004, Mr. Dickson completed his fifth set-off. Once again, he was denied parole. This time, he received a three year set-off. The reasons have always been the same, nature of the offense and his parole violation.

290. The list of set-offs issued to Mr. Dickson is very typical of the experience endured by technical parole violators. The Parole Guidelines have no basis for analyzing inmates like Mr. Dickson within a technical parole

context. As a result, technical parole violators end up serving enormous stretches of time for such matters as failing to tell their parole officer that they moved, or for turning in a dirty urine specimen. In Mr. Dickson's case, he is being punished again for the crime that he committed in Arkansas.

291. When Mr. Dickson's latest set-off is completed, he will have served nine years for his technical parole violation. Looking through form to substance, Mr. Dickson has been prosecuted and sentenced by Defendants a second time for his Arkansas crime. When these set-offs ceased to be remedial and turned punitive, the line was crossed and the 5th Amendment's Double Jeopardy Clause was violated. Nine years is certainly prosecutorial under any base line employed for distinguishing a remedial from a punitive prison term.

292. Class members released on parole, then returned to prison for a parole violation to serve a series of set-offs equaling a punitive sentence are likewise being punished a second time for their crime after being convicted. These cases are legally indistinguishable from Mr. Dickson's case. The civil rights of these inmates are also violated under the Double Jeopardy Clause.

## Claim 3 – Ex Post Facto Clause

293. Paragraphs 1 through 289 are hereby incorporated by reference and inserted into this claim, as if each paragraph was fully printed here.

294. Article I, Section 10 of the U.S. Constitution provides, "no State …

shall pass any ... ex post facto law." *Ex Post Facto* is a term of art with an established meaning at the time the U.S. Constitution was ratified. This Clause forbids the Congress and the States from enacting any law which (a) imposes a punishment for an act which was not punishable at the time it was committed or (b) imposes additional punishment to that then prescribed.

295. An *ex post facto* claim must be retrospective. It must apply to events occurring before its enactment. To violate the Ex Post Facto Clause, it must be disadvantageous to the offender. Critical to relief under the *ex post facto* clause is lack of fair notice and governmental restraint when the legislature increases punishment above what was prescribed when the crime was consummated. Even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the *ex post facto clause* if it is both retrospective and more onerous than the law in effect on the date of the offense.

296. Every law that changes the punishment, and inflicts a greater punishment than the law annexed to the crime when committed"[46] can be held suspect pursuant to this clause.

297. In evaluating any *ex post facto* claim, it is the effect of the law, not the law's form that determines whether or not it is *ex post facto*. If the new law

---

[46] Calder v. Bull, 3 U.S. (Dall.) 386, at 390 (1798)

has the effect of taking away or impairing vested rights acquired under the law existing when the offense was committed, this effect can be declared *ex post facto*. The critical question is whether the law changes the legal consequences of acts completed before its effective date. *Ex post facto* forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred.

298. The scope of the Ex Post Facto Clause is not limited to statutes passed by legislatures. The danger of certain persons falling into disfavor and becoming the subject of punishment after the fact is present in the parole context. The Ex Post Facto Clause guards against such abuses wherever found.

299. Violating the Ex Post Facto Clause qualifies as a constitutional violation in satisfaction of the Prison Litigation Reform Act of 1996.[47] When evidence indicates the Parole Board has violated the U.S. Constitution, the matter may be reviewed by a Federal court pursuant to §1983.

**(a) Raising a High Hurdle for Exercise of Discretion to Capital Murder**

300. The 70th Legislature (September 1, 1989 to August 31, 1991) passed a statute stipulating that anyone convicted of the crime of capital murder had to serve a minimum of 35 calendar years before they become eligible for parole. This statute, by its terms, was strictly forward looking or

---

[47] Pub. L. No. 104-134, 110 Stat. 1321

prospective, and did not apply to crimes committed before its passage.

301. The 72nd Legislature (September 1, 1991 to August 31, 1993) enacted a law which required all offenders convicted of capital murder to serve 40 calendar years and further required at least a two-thirds vote of the entire Parole Board for granting parole.

302. Only the hardiest of inmates can survive 35 or 40 calendar years in prison, given the almost nonexistent availability of medical and dental care. If an inmate is healthy and lucky enough to survive this term, the feat of securing a two-thirds majority of all members of the Parole Board is virtually impossible. The net result of these two statutes is that Life with eligibility for parole simply became Life. This new policy precludes meaningful parole review for parolable lifers committing crimes after enactment of these laws.

303. Prior to 1993, the Parole Board was an independent entity and insulated from political pressures. Once the reorganization of all state agencies dealing with criminal justice was complete, the Parole Board only remained independent on paper. Its operations and its decision-making came under the direct authority of the Texas Department of Criminal Justice. The Parole Board effectively became a puppet of this executive agency.

304. Since 1993, the Parole Board has been vulnerable to political pressures and influence. Legislation passed in the 70th and 72nd Legislatures

requiring a person convicted of capital murder to serve 35 or 40 calendar years before becoming eligible for parole, attests to a climate of repugnance toward class members convicted of this crime. Once the Parole Board became the puppet entity of the Texas Department of Criminal Justice, this attitude of disdain toward class members convicted of capital murder was immediately adopted and reflected in Parole Board decision-making.

305. Since 1993, Parole Board decision-making has been orchestrated and dictated by the Texas Department of Criminal Justice, acting through its Classification and Records division. Inmate files are all maintained by the Classification division in the Texas Department of Criminal Justice. The Parole Board can no longer ascertain independently and through its own resources, which class members committed capital murder. This function has shifted to the Classification division. As a result, the exercise of Parole Board discretion is now dependent upon a prompt from the Classification division.

306. Classification has adopted a policy and a practice of treating class members convicted of capital murder in accord with laws adopted by the 70th and 72nd Legislatures. These laws suspend the exercise of Parole Board discretion until at least 35 or 40 calendar years have been served.

307. Historically, Texas has treated murder as an indefinite sentence,

like any other indefinite sentence.[48] Where the maximum sentence was greater than four times the minimum sentence, the inmate convicted for murder could qualify for parole after serving one fourth of the maximum sentence. [49] Earlier, we noted how "life" meant 60 years in Texas, acquired through Good Time as well as calendar time. Under the 1925 statute, which to our knowledge has not been explicitly overruled or superseded until relatively recently, indeterminate sentencing law applied to murder cases. This meant an inmate with a perfect prison record could be paroled after serving 15 or 20 years. [50] We have class members with convictions going back to the 60th Legislature (1967 – 1977).

308. If an inmate convicted of murder during the 65th Legislature was not released after serving their minimum sentence, they could count upon getting released and getting their crime discharged after their Good Time, Program Credits and calendar time equaled 60 years. For a rehabilitated class member, this would require between 24 and 26 calendar years of service.

309. The practice of treating a class member convicted of capital murder under the 65th Legislature or earlier, by applying laws enacted by the 70th or the 72nd Legislatures, constitutes a radical revision to the regime in force at the time of these earlier convictions.

---

[48] *See* Vernon's Ann. Code, Art. 775 [Acts 1925, 39th Leg., ch.. 165, p. 377 § 1].
[49] *See* Vernon's Ann. Code, Art. 775a [Acts 1925, 39th Leg., ch.. 165, p. 377 § 1.
[50] 15 years applied to the 55th and 59th Legislatures. 20 years applied to 60th .

310. Due to the Parole Board's current vulnerability to political pressure, this radical change in policy toward class members convicted of capital murder has the effect of delaying the prompt from Classification to the Parole Board and suspending the exercise of Parole Board discretion until 35 or 40 calendar years have been served, without regard to the norms of practice in place – as understood by prosecutors, judges, probation departments, defense counsel, the public and defendants – when these class members were convicted.

311. As a result of the above, class members convicted of capital murder prior to the 70th Legislature are being substantially disadvantaged by the current practice of suspending the exercise of Parole Board discretion until a minimum or either 35 or 40 years have been served, contrary to the law in force at the time of the crime, which recognized the full satisfaction of a Life sentence after 24 to 26 years of exemplary service.

312. Suspending the exercise of Parole Board discretion by ten or more years has as its effect, the creation of a high hurdle to the exercise of discretion, exposing all of these class members to a substantial risk of serving an increased sentence, and thereby violating the Ex Post Facto Clause.

**(b) Raising a High Hurdle for Exercise of Discretion to Sex, Child Crimes**

313. Like class members convicted of the crime of capital murder, class

members convicted of sexual crimes and crimes committed against a child have fallen into strong disfavor in the 1990's.

314. The 73rd Legislature made the crime of Indecency to a child 2nd degree a 3(g) crime, which meant that the first half of the sentence had to be served day for day. The 75th Legislature added the crimes of Indecency with a Child 2nd degree and Indecency with a Child 3rd degree to the list of offenses ineligible for Mandatory Supervision. This meant that good time and work credits served only one purpose, and that was to move forward their initial eligibility for parole. Good time and work credit could not be applied toward early release. Like the impact of a 3(g) crime, class members convicted of these crimes against a child were likely to serve a very high percentage of their sentence in calendar time.

315. The 70th Legislature made the crime of Sexual Assault 2nd degree, and Aggravated Sexual Assault 1st degree ineligible for mandatory supervision. This meant that Good Time and Work Credits could not be applied toward early release. Aggravated Sexual Assault was also included among the initial list of 3(g) crimes, which required ¼ of the calendar sentence to be served before becoming eligible for parole consideration.

316. Since 1993, the Parole Board has been a puppet entity of the Texas Department of Criminal Justice, and vulnerable to political pressures and

influence. The public's attitude of disdain toward sex and child crimes was immediately adopted and reflected in Parole Board decision-making.

317. Since 1993, Parole Board decision-making has been orchestrated and dictated by the Texas Department of Criminal Justice, acting through its Classification and Records division. Inmate files are all maintained by the Classification division in the Texas Department of Criminal Justice. The Parole Board can no longer ascertain independently and through its own resources, which class members committed sex crimes and crimes against a child. This function shifted to Classification. The exercise of Parole Board discretion is now dependent upon a prompt from the Classification division.

318. Offenders with sex crimes are currently held in very ill repute by the public. This perception has created an opportunity to harvest political capital by being tough on sex offenders. Since 1993, when the Parole Board became a puppet entity of the Texas Department of Criminal Justice, parole decision-making has responded to this popular sentiment. Class members convicted of sex crimes are being required to serve 80% or more of their maximum sentence in calendar time before Classification is prompting the Parole Board and requesting them to exercise discretion regarding their cases.

319. Offenders with crimes against children are currently held in very ill repute by the public. This perception has also created an opportunity to harvest

political capital by being tough on these offenders. Since 1993, when the Parole Board became a puppet entity of the Texas Department of Criminal Justice, parole decision-making has responded to this popular sentiment. Class members convicted of crimes against children are being required to serve 80% or more of their maximum sentence in calendar time before Classification is prompting the Parole Board and asking them to exercise discretion regarding their cases. In many cases, class members are receiving *serve all* slips.

320. Many class members being held for 80% or more of their maximum sentence in calendar time were convicted before these tough laws were enacted. Nevertheless, Classification has adopted a policy and a practice of grouping all of these offenders together and treating them in this fashion.

321. Class members convicted of sex and child crimes under the 65th Legislature and earlier were entitled to serious release consideration at their initial parole review, when calendar time and Good Time equaled 1/3rd of their sentence. The practice of requiring a class member convicted of either a sex or a child crime under the 65th Legislature or earlier, to serve typically 80% or more of their maximum sentence in calendar time before prompting the Parole Board to exercise its discretion constitutes a radical revision to the regime in force at the time of these earlier convictions.

322. Due to the Parole Board's current vulnerability to political

pressure, this radical change in policy toward class members convicted of sex and child crimes has the effect of delaying the prompt from Classification to the Parole Board and suspending the exercise of Parole Board discretion beyond the initial parole review and for years into the future, without regard to the norms of practice in place when these class members were convicted.

323. As a result of the above, class members convicted of sex and child crimes prior to the 70th Legislature are being substantially disadvantaged by the current practice of suspending the exercise of Parole Board discretion until 80% or more of the calendar time has been served, contrary to the law in force at the time of the crime, which required the exercise of discretion after serving one-third of their sentence and this component included Good Time.

324. Suspending the exercise of Parole Board discretion by these increments of time has as its effect, the creation of a high hurdle to the exercise of discretion, exposing all of these class members to a substantial risk of serving an increased sentence, and thereby violating the Ex Post Facto Clause.

**(c) Inflicting Penal Statutes in a More Onerous and Retroactive Manner**

325. The Texas Legislature has a history of passing legislation which singles out specific crimes for special treatment and making penalties applicable to these crimes especially harsh. In particular, the 70th Legislature created a new class of crimes called 3(g) offenses, which required one-fourth

of the maximum sentence to be served in calendar time before becoming eligible for parole. Another innovation of the 70th Legislature was to exempt a list of crimes from mandatory supervision.

326. Subsequent Texas legislatures have increased the amount of time required for a 3(g) offense from one-fourth to half of the sentence, and new crimes have been declared exempt from mandatory supervision.

327. Named Plaintiff Tammy Hudson was convicted of Aggravated Sexual Assault. This occurred in 1992. At the time, her crime was considered an aggravated 3(g) crime. The special treatment required for committing an aggravated 3(g) crime necessitated serving the first quarter of your sentence day for day, receiving no benefit from Good Time, before becoming eligible for parole. The 73rd Legislature changed this law and required all inmates convicted of a 3(g) offense to serve half their sentence day for day. Defendants are applying the harsher 1994 law retroactively to Ms. Hudson's case.

328. Named Plaintiff Leo Fennessey was convicted during the 65th Legislature. Under the law in force at the time of his crime, he is entitled to a parole review annually. In the latest legislature, the Parole Board has been given authority to issue a set off for between one to five years. [51] At his latest parole review, Mr. Fennessey was given a four year set-off. This has extended

---

[51] *See* V.T.C.A., Government Code, § 508.141 (g).

his eligibility for parole three extra years beyond the time allowed when he was convicted, and he is being deprived of three reviews. The application of this rule retroactively substantially disadvantages class members with convictions under the 65th Legislature. This also applies to class members convicted under the 70th Legislature, who are also entitled to an annual review.

329. The 75th Legislature added the crime of 2nd degree murder to the list of offenses exempt from mandatory supervision. There are class members that committed the crime of 2nd degree murder before it was made exempt from mandatory supervision. However, like the treatment accorded Ms. Hudson, these class members are being treated as if the law from this latest legislature applied to their crime.

330. This list is illustrative and not exhaustive. As Discovery unfolds, we expect to encounter additional evidence of this practice. In every instance where the law is made more severe, the Parole Board has been applying this more severe statute to cases of class members whose crimes were committed prior to the new law's effective date. In instances in which a statute merely alters a provision accorded by the grace of the legislature, such as extending the length of a set-off, the Parole Board has been applying these statutes to class members in a prejudicial manner. For example, while the Parole Board could have given Mr. Fennessey a one year set-off consistent with the law

under the 65th and 70th Legislatures, these Defendants opted instead to issue a four year set-off.

331. Class members are being substantially disadvantaged by the practice of applying laws retroactively which are more onerous than the law affixed to the crime at the time of its commission. This Parole Board practice serves one purpose, namely to extend prison sentences, thereby exposing all of these class members to a substantial risk of serving an increased sentence retroactively. In every such case where this occurs, the Ex Post Facto Clause is being violated.

**(c) Substituting a Greater Punishment for Terms Affixed to the Crime**

332. Since 1993, the Parole Board has been reduced to the status of a puppet subject to the control of the Texas Department of Criminal Justice. In its captive capacity, the Parole Board has become subjugated to the business agenda of this executive agency. In practical terms, this means blocking the exit doors for thousands of offenders' eligible and deserving of being released, to be sure that beds in all institutions remain full and the talent required to run prisons and prison industries remains in place.

333. The Texas Government Code and the Texas Administrative Code contain provisions which spell out the suitability criteria for earning a parole. The Texas Government Code further requires these Defendants to promulgate

parole guidelines and apply these parole guidelines. Presumably, the adoption and application of these parole guidelines are to be consistent with the suitability criteria for parole, and to further act as a check on compliance.

334. These Defendants have ignored the suitability criteria for parole that is set forth in the Government Code, the Texas Administrative Code and the Offender's Handbook. These Defendants have further concocted parole guidelines which actually frustrate the purpose typically served by guidelines, which is to pull together strands making up the current suitability criteria so as to structure decision-making and thereby insure compliance with these laws.

335. Instead, Defendants steadfastly maintain their right to exercise unfettered discretion. Under the guise of exercising unfettered discretion, Defendants have promulgated a secret set of guidelines. The full extent and nature of these guidelines are still unknown and will not be known until Discovery is completed. However, several guidelines are readily apparent.

336. Defendants have made a conscious decision to totally disavow, just as if they did not exist, the suitability criteria for parole adopted by the Legislature. These rules were tailored for an independent Parole Board, capable of making independent decisions. Given the Parole Board's subordination to the political pressures and business exigencies of a major executive department, these rules are now totally infeasible and incompatible

121

with the Parole Board's new mission under T.D.C.J.

337. Defendants have dismissed the minimum sentence set by operation of law for all offenders as if this did not exist. In the minds of these Defendants, the maximum sentence serves as the only sentence. Dismissing the minimum sentence has the further consequence of reducing the initial parole review ordered by the Legislature to a hollow, bureaucratic formality.

338. Instead of getting serious release consideration after serving one fourth of a sentence, Defendants have raised the bar to require as many offenders as possible to serve at least half of their maximum sentence, and this contemplates service in calendar time.

339. To justify this additional time, Classification has been instructed to demonize all offenders by giving them a *general offense character* score or assessment which, to the extent feasible, colors their crime aggravated or paints the offender as violent. These labels facilitate the goal of rendering Good Time and Work Credits meaningless, after accelerating the date of their initial – and purely ceremonial and devoid of substance - parole review.

340. These secret guidelines have replaced the suitability criteria promulgated by the Legislature. The primary purpose served by these secret guidelines is to stretch prison sentences and thereby maintain all efficiencies of scale realized through 100% occupancy of their prisons. Class members are

being substantially disadvantaged by the substitution of these secret guidelines for lawfully adopted rules, because these secret guidelines are exposing class members to a substantial risk of serving an increased sentence retroactively.

341. The promulgation of secret guidelines and their retroactive implementation, in place of the suitability criteria in the Government Code, the Texas Administrative Code and the Offender's Handbook, constitutes the infliction of a new punishment more severe than the penalty affixed to the crime at the time of its occurrence, in violation of the Ex Post Facto Clause.

## Claim 4 – Due Process

342. Paragraphs 1 through 341 are hereby incorporated by reference and inserted into this claim, as if each paragraph was fully printed here.

343. The Due Process Clause of the U.S. Constitution has been applied to the States via the 14th Amendment [U.S. Const., Article XIV, § 1], which states: "… No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property without due process of law, …".

344. Violating the Due Process clause qualifies as a constitutional violation in satisfaction of the Prison Litigation Reform Act of 1996. [52] When evidence indicates the Parole Board has violated the U.S. Constitution, the

---

[52] Pub. L. No. 104-134, 110 Stat. 1321

matter may be reviewed by a Federal court pursuant to §1983.

## (a) State Created Liberty Interest in Mandatory Supervision Date

345. The Supreme Court decisions Greenholtz v. Inmates of Nebraska[53]
and Board of Pardons v. Allen[54] hold that when a state statute creates a
mandatory parole scheme, the Due Process Clause protects that interest.

346. Texas has two avenues for early release from prison. The shortest
avenue is parole. This can be granted after calendar time and good conduct
time equal one-fourth of the maximum sentence.[55] The second avenue is
Mandatory Supervision.[56] This can be granted when calendar time and accrued
*good conduct time* equal the maximum sentence. Texas considers Mandatory
Supervision as merely another form of parole.[57] In both cases, the inmate is
released before serving the entire calendar time of their sentence.

347. While Texas state law creates an indeterminate sentencing scheme,
it also creates a well defined mandatory supervision date.[58] The Fifth Circuit
has held that the Texas mandatory supervision statute creates an expectancy of
early release when the calendar time of eligible inmates, combined with good

---

[53] 442 U.S. 1 (1969). [Hereafter *Greenholtz*].
[54] 482 U.S. 369 (1987) [Hereafter *Allen*].
[55] *See* V.T.A.C., Government Code § 508.145 (f).
[56] *See* V.T.A.C., Government Code § 508.147.
[57] *See* V.T.A.C., Government Code § 508.147 (b) [An inmate released to mandatory
supervision is considered to be released on parole.]
[58] *See* V.T.A.C., Government Code § 508.147. [Release to Mandatory Supervision]

time credits, equals the sentence imposed.[59] Pursuant to *Greenholtz* and *Allen*, Texas has created a mandatory parole scheme. Inmates eligible for mandatory supervision have a state created liberty interest in getting released on this date.

348. Once a liberty interest is established, Texas inmates have a right under the Due Process Clause to be free of arbitrary state action.[60]

349. The Texas statute for Mandatory Supervision further carries a statutory presumption slanted toward release. Unlike parole, which requires votes in favor of release, mandatory supervision requires the offender to be released absent Parole Board action to the contrary.

350. To overcome this presumption and block the release of a class member on the mandatory supervision date, the Parole Board has to make two findings: (1) the inmate's accrued good conduct time is not an accurate reflection of the inmate's potential for rehabilitation; and (2) the offender's release would endanger the public.[61]

351. The governing parole statute [62] restricts the Parole Board's review to the two questions specified for overcoming the presumption favoring mandatory supervision. Although the Parole Board still retains some

---

[59] *See* Malchi v. Thaler, 211 F.3d 953, 957-58 (5th Cir. 2000), *citing* Wolff v. McDonnell, 418 U.S. 539, 557, 94 S. Ct. 2963, 2975, 41 L. Ed. 2d 935 (1974)

[60] Daniels v. Williams, 474 U.S. 327, 331 (1986).

[61] 74th Legislature, H.B. 1433 Comm. Report (Amended). *See also* V.T.C.A. Government Code § 508.149(b)

[62] *See* V.T.A.C. Government Code § 508.149(b)

discretion, a panel has much less discretion when determining whether or not an inmate can be released on mandatory supervision. The two statutory findings require predictive judgments, which necessarily require current and accurate information as to the inmate's conduct. References to the nature of the offense, without more, are insufficient to carry the Parole Board's burden of proof because this information is by definition dated and, this information has also been superseded by more recent evidence of conduct while in prison.

352. A parole panel acts arbitrarily when it seeks to block the release of an inmate eligible for mandatory supervision by referring to unchanging factors such as the nature of the crime and prior criminal history, while refusing to acknowledge highly probative evidence germane to the questions of whether their accrued good conduct time accurately reflects their potential for rehabilitation and whether or not their release would endanger the public.

353. The two findings set forth in Government Code § 508.149(b) are vague and susceptible to abuse. Both findings are vague because they require subjective judgments. [*Accurate reflection of the inmate's potential for rehabilitation* springs from the decision-makers' perception of achievement. The phase *will endanger the public* springs from a perception of *danger*.] A susceptibility to abuse is always present when there are no restraints upon the exercise of discretion, and subjective judgments are necessarily being made.

354. Plaintiffs maintain that Defendants are abusing their discretion when considering whether or not an inmate's *good conduct time* is an accurate reflection of their potential for rehabilitation, and whether or not their release would endanger the public. Defendants have a practice of providing only generic, form letters as good cause for blocking an inmate's mandatory supervision date. It is arbitrary and capricious for a parole panel to block an inmate's release on their mandatory supervision date by providing a letter with boilerplate  language applicable to any inmate as good cause, and failing to submit detailed evidence, coupled with a reasoned decision, addressing both the presumption in favor of release and how the evidence examined is probative, germane, and constitutes proof equivalent to a preponderance of the evidence, in support of their position.

355. In Texas, inmates eligible for mandatory supervision receive a standardized form which states: "Before your projected release date, the Board will review your file and all available records to determine if you will be released."  The tenor of this sentence reverses the presumption and appears to shift the burden by making the inmate justify their release under mandatory supervision. This document does not spell out the inmate's vested interest in being released, the duty imposed upon the Parole Board to justify continuing incarceration and the factual findings necessary to block their release.

356. In Texas, inmates are not entitled to see in advance any evidence that may be used by the Parole Board to demonstrate how their *good conduct time* is not an accurate reflection of their potential for rehabilitation, or any evidence which the Parole Board intends to rely upon for finding that their release would endanger the public.

357. In Texas, inmates are not entitled to a meaningful hearing prior to their mandatory supervision date, where evidence is tendered by the inmate and by the Parole Board, a record is maintained of the proceeding by way of an audio recording, a neutral and objective decision-maker is present and the conclusion reached at the hearing is based solely upon evidence entered into the record. Given the hierarchal structure of T.D.C.J., even a Parole Board member can no longer be counted upon to be neutral and objective.

358. Inmates are not allowed to appear in front of their decision-makers. Instead, the true decision-makers conduct a file or paper review. The inmate has no way of knowing what is actually being reviewed. Inmates do not receive a reasoned decision discussing the evidence relied upon, the presumption in favor of release and discussing how the preponderance of the evidence overcomes the two findings specified by the Mandatory Supervision statute. Instead, inmates receive a form letter giving them perfunctory notice that their release to mandatory supervision has been denied, typically because

of unchanging factors such as the nature of their crime and a prior criminal history. Unchanging factors in general are insufficient to block their release.

359. In Texas, inmates have no administrative or judicial remedies to pursue if their mandatory supervision release is denied.[63]

360. All of the flaws set forth herein relating to the notice, the lack of a meaningful hearing, the lack of a reasoned decision and the absence of an appeal avenue constitute further violations of the Due Process Clause.

361. For reasons enumerated herein, class members have been denied due process of law. Since class members possess a liberty interest which has been unlawfully frustrated, these class members further possess, upon a finding in their favor on this cause of action, a claim for habeas corpus relief.

**(b) Holding Parole Violators Extended Periods Awaiting a Hearing**

362. Class members engaged by this portion of the Due Process claim have been released on parole. Although still subject to the terms of a mandatory supervision agreement, the legal status of these class members is altogether different from an incarcerated class member. The existence of a liberty interest for a paroled class member is obvious. Defendants seek to extinguish this liberty interest. Once a liberty interest is established, class members have a right to be free of arbitrary state action. The Due Process

---

[63] V.T.C.A., Government Code § 508.149 (d).

Clause protects this liberty interest from arbitrary and capricious state action.

363. As a matter of policy and practice, Defendants do not require a showing of probable cause that a parolee has in fact committed a parole violation before issuing an arrest warrant. Defendants can be prompted to issue an arrest warrant upon any provocation and before there is any factual basis to support the position that a parole violation has taken place.

364. Defendants are supposed to conduct a preliminary interview within five days of taking a parolee into custody. This preliminary interview is supposed to be the functional equivalent to a showing of probable cause. In practice, Defendants do not conduct these preliminary interviews within 5 days on a consistent basis. Indeed, weeks and even months can pass before these preliminary interviews are conducted.

365. When it finally does take place, the preliminary interview is conducted by a field parole officer. This parole officer is supposed to make a determination at the conclusion of this interview as to whether or not probable cause exists to find the parolee in violation of their parole. Typically, no binding probable cause determination is made at the conclusion of this interview. Often, a binding determination as to probable cause does not occur until months after the arrest. In the meantime, the parolee languishes in either a county jail or a state prison.

366. The substantial delay in conducting a meaningful preliminary interview ensures that, once the Defendants do make a binding probable cause determination, the decision-maker is not neutral and objective. The need to justify the extended detention which has already taken place gives this decision-maker a strong incentive to find probable cause, even if none exists.

367. The revocation hearing is supposed to be convened within two weeks of conducting the preliminary interview. Defendants do not conduct what they deem to be a revocation hearing for months and in many cases up to a year or longer after the arrest has been made. In the meantime, the parolee continues to languish in jail or prison.

368. The proceeding labeled by Defendants as a revocation hearing is not a proceeding within the constitutional and legal meaning of that term, and it does not comport with even the rudimentary requisites of due process. For example, Defendants do not disclose the evidence held to justify the violation of a parole until just before the hearing, if at all.

369. The revocation hearing is also conducted by a field parole officer. After the lengthy detention caused by indifference and neglect, the hearing officer has a substantial incentive to vindicate this extended detention by finding the parolee guilty of the conduct alleged. Evidence in support of revoking parole is invariably found to be persuasive, while evidence disputing

this finding is given little or no credibility. In this manner and for this reason, the hearing officer is not neutral or objective about this case. Often, the end result is foreseeable and evident even before the hearing has begun.

370. The terms of parole agreements impose stringent requirements such as notifying the field parole officer immediately of any change in address and to report all changes in employment immediately. The term *immediately* can mean early the next day to one person, and later the same day to another. These are the kinds of infractions leading to violations. Plaintiffs believe and therefore allege that violation of many of these provisions are not so serious as to justify a continued loss of liberty, and that many such class members could have been released from custody if Defendants had provided them with a preliminary hearing and a revocation hearing within 19 days of being arrested.

371. To the extent that the hearing officers have discretion to invoke lesser sanctions than incarceration and to proceed by way of summons rather than a pre-hearing detention, Defendants' procedures deprive affected class members of the opportunity to have the hearing officer utilize these lesser mechanisms because doing so would effectively constitute an admission that the lengthy pre-hearing delay was unwarranted.

372. Due to this dilatory practice, class members with revoked paroles have suffered prolonged confinement without any meaningful determination of

132

probable cause and without any meaningful hearing regarding whether allegations forming the basis for revocation justify continued incarceration.

373. Class members have no administrative procedures available to challenge the Defendants failure to provide prompt, meaningful preliminary interviews and final revocation hearings. Further compounding this injury, after revoking parole, Defendants treat technical parole violators as if they had committed a new felony by issuing set-offs extending for five or ten years and even longer, because there is nothing in the Parole Guidelines addressing the plight of a technical parole violator and treating them appropriately.

374. Revoking parole in such a perfunctory and constitutionally flawed manner further violates the Due Process Clause when the consequence of this parole violation – set-offs for five or ten years of additional incarceration for conduct that has not been adjudicated as criminal – is taken into account.

375. These practices related to the revocation of paroles and the failure to deal with a technical parole violator on terms equivalent to misdemeanors, violate the Due Process Clause of the 14th and 5th Amendments. Plaintiff class members seek declaratory and injunctive relief to halt both practices.

**(c) Atypical, Significant Hardship Exceeding Normal Incidents of Prison**

376. Regular parole eligibility is not procedural. It is substantive. Parole eligibility is annexed to the sentence and considered part of the punishment.

377. Although Texas inmates have no vested right to a parole, the state is not allowed to arbitrarily abrogate an offender's right to be considered for parole. Texas has a comprehensive statutory scheme offering parole eligibility. Acts of the legislature cannot be transformed into pretense or empty formality. Once the prospect of parole is offered, the opportunity must be genuine and it must conform to the statutes and administrative regulations which govern.

378. Since 1993, the Parole Board has been impaired and unable to perform its statutorily assigned duties, due to a lack of personnel and resources. In its place, class member files are being maintained, reviewed and acted upon by clerks and administrators in T.D.C.J's Classification division.

379. Since 1993, the Parole Board's status as an independent agency is illusory. In real life, the Parole Board has been subordinated to the hierarchal structure of the Texas Department of Criminal Justice. Where the Parole Board was previously insulated from political pressures and influences, its decisions have now become a bellwether for shifting tides of public sentiment, mirroring the political pressures and influences prevailing in the public at large.

380. Since 1993, the Parole Board has become a tool for maintaining the inmate population of T.D.C.J. The necessary qualifications for releasing an inmate on parole have become corrupted with capacity concerns. If new entrants are dropping, an inmate's release can be blocked simply to maintain

the economies of scale realized through the use of every available bed.

381. The cumulative effect of reducing the Parole Board to the functional equivalent of a puppet operating at the pleasure of the Texas Department of Criminal Justice is to realize a radically different regime, than the one contemplated by the Legislature's pertinent parole eligibility statutes in the Government Code and the Texas Administrative Code. The suitability criteria for parole set forth in these rules are not being implemented. Parole guidelines possess only an aura of legitimacy. Under inspection, their usefulness evaporates. Parole applicants without attorneys receive no attention at all, unless and until the Classification division finally sees fit to prompt the Parole Board into acting upon the file.

382. The real regime consists of clerks and administrators diligently seeking ways to demonize parole candidates, studiously exploring avenues for piecing together horrific *general offense character* profiles, which are then substituted for the factual findings of a trial court. As a result, when a class member becomes eligible for parole consideration, they are unknowingly being prosecuted, judged and sentenced for new criminal behavior.

383. The real regime consists of transforming good conduct time and work credits into an enigma, something of value which has been earned, but the only store where this valued item can be redeemed is permanently closed.

384. The real regime consists of remaining impaled by the crime and using unchanging factors to deny parole, while ignoring as if it did not exist a plethora of evidence documenting how an inmate has addressed their anti-social behavior with programs and maintained an admirable work ethic.

385. The net result is that the statutory scheme for parole eligibility contemplated by the Legislature has been arbitrarily abrogated. Outward manifestations of this scheme, such as the interview with the institutional parole officer, are offered to present the appearance of parole consideration, while simultaneously camouflaging the fact that there is no real consideration.

386. As parole in Texas has become a political football, sentencing in Texas has become an extraordinarily brutal ordeal. The maximum term of a 2nd degree felony in Texas (i.e. 20 years) exceeds the maximum term of a 1st degree felony in other states.[64]  Texas juries deciding sentences are informed about *good conduct time*, which can increase the sentence by two and a half times, and this factor is getting incorporated into their equations, extending the sentence to insure that the time considered appropriate is actually served. At the same time, the Classification division of T.D.C.J. is scheming to insure that *good conduct time* is rendered worthless.

387. All of the above dynamics require Texas prisoners to endure an

---

[64] As a matter of comparison, Ohio, a state well known by counsel, has a maximum 10 year statute for a 1st degree felony and a maximum 8 year sentence for a 2nd degree felony.

atypical, significant hardship exceeding the normal incidents of prison life.

388. A liberty interest can spring from two sources. The state can create a liberty interest, and a liberty interest can spring from the Due Process Clause itself. Texas has not created any liberty interest for an inmate in its regime for regular parole. Under these facts, the liberty interest must spring from the Due Process Clause of the U.S. Constitution.

389. Texas prisoners are enduring an atypical, significant hardship exceeding the normal incidents of prison life, which in turn prompts a liberty interest springing from the Due Process Clause of the U.S. Constitution. The rights of these Plaintiffs are being violated by the arbitrary abrogation of the state's statutory process for parole consideration. Texas inmates have a right, under the Due Process Clause of the U.S. Constitution, to be free of state action which is arbitrary, irrational and / or tainted by an improper motive. Accordingly, the Due Process Clause may be invoked for relief.

390. The process to which these class members are entitled consists of the application of the statutes and administrative rules governing parole, in the manner and in the spirit in which they were promulgated and once utilized by the Texas Parole Board, before its authority was emasculated and rendered impotent. Class members are further entitled to paroles if the suitability criteria can be satisfied. Finally, if class members are denied parole for reasons

existing outside the suitability criteria, such as unchanging factors, due process requires that they be allowed to appeal this decision to a court of law.

**(d) Due Process Infringements Upon Life Sentences for Murder**

391. Prior to the 70th Legislature, the punishment for a criminal defendant convicted of murder and deemed unsuitable for parole consisted of death. If the criminal defendant was suitable for rehabilitation, they received a Life sentence *with eligibility for parole*. Like the Life sentence issued for a 1st degree felony, a Life sentence for murder was an indeterminate sentence. Like any other crime carrying parole eligibility, convicted murderers with Life sentences were eligible for parole after serving 15 or 20 calendar years, and they were eligible for mandatory release after serving the equivalent of 60 years of accumulated calendar time, *good conduct time* and program credits.

392. Since 1993 and possibly earlier, Defendants have a practice of amending the sentence for murder issued by a trial court from *Life with eligibility for parole* to simply *Life*. This practice is reflected and confirmed by the following overt acts. (1) Inmates with convictions for murder are typically and routinely receive the longest and next to longest set-offs, contrary to a record of exemplary service and conspicuous rehabilitation and, (2) the reason given for every set-off is *nature of the offense*.

393. Plaintiffs are informed and believe, and therefore allege that files

138

of class members with murder convictions are being pre-judged by Classification after simply glimpsing at the title of the crime. No consideration of any kind is given to the contents of an inmate's institutional record.

394. As a result, class members with murder convictions have been continued three, four, five and even more than five times, all for the same reason, *nature of the offense.* If no other basis is given for a set-off, aside from *nature of the offense*, the repeated use of this unchanging factor becomes arbitrary and rises to a Due Process violation.

395. In this manner, Defendants have violated the civil rights of class members convicted of murder prior to the 70th Legislature.

396. The facts set forth for class members with murder convictions dating back to the 65th Legislature and earlier, apply with equal force to other class members with convictions dating back to the 65th Legislature and earlier, such as class members with sex crimes and crimes against children, currently subject to serving 30 year maximum sentences or more. Classification is also pre-judging these files based upon a glimpse of the crime's title, than rendering *good conduct time* worthless and issuing set-offs, listing repeatedly as their only reason, *nature of the offense.* As in the case of a murder conviction, these are arbitrary actions, in violation of the Due Process clause.

## Claim 5 – Involuntary Servitude

397. Paragraphs 1 through 396 are hereby incorporated by reference and inserted into this claim, as if each paragraph was fully printed here.

398. The 13th Amendment to the U.S. Constitution and its enforcing statutes are designed to apply to a variety of circumstances and conditions. Neither is limited to the classic form of slavery. Both apply to contemporary as well as to historic forms of involuntary servitude. As construed, the term *involuntary servitude* carries a meaning broader than slavery.

399. Violating the Involuntary Servitude prohibition qualifies as a constitutional violation in satisfaction of the Prison Litigation Reform Act of 1996.[65] When evidence indicates the Parole Board has violated the U.S. Constitution, the matter may be reviewed by this Court pursuant to §1983.

400. The 13th Amendment and its implementing statutes were intended not merely to end slavery but to maintain a system of free and voluntary labor throughout the United States. Texas has an unbecoming history of enacting black codes intended to lock former slaves into the service of their old masters. While black codes are thankfully relegated to history, the exigencies of modern life have resourcefully invented new methods of involuntary servitude functionally equivalent to black codes.

---

[65] Pub. L. No. 104-134, 110 Stat. 1321

140

401. Under the realities of modern economic life, the servitor is no longer destined to be black. This person can be Asian or Hispanic. They can be poor, illiterate and mentally feeble. They can be migrant workers.

402. Typically, the relationship between the servitor and overseer begins on a proper basis, governed by an agreement that is legal and enforceable. At some point, the legitimacy of the relationship expires and coercion begins. A passport is confiscated, instantly turning a foreign born household servant into a helpless captive. Under the facts of this case, the plight of certain Texas inmates is legally indistinguishable from migrant workers and other minorities subjected to systematic and methodical exploitation for profit. These are our 20th Century counterparts for slaves.

403. Texas prisons are filled with downtrodden inmates reflecting large segments of modern day society currently being exploited, such as the poor, mentally feeble, the illiterate and the undocumented foreign born with poor English skills. All of these people have little or no property, few skills and minimal hope, and are thus easy prey for unscrupulous organizations.

404. In the last twelve years, Defendants have built a prison industrial empire. To put the size of this prison empire into perspective, it is on schedule to equal and then surpass the number of inmates maintained by the Federal government in the next two years, if not sooner. Texas has already

eclipsed California, which has about ten million more residents, as the largest inmate population among the states.

405. Texas prisoners are subjected to extraordinary isolation. Unlike federal prisoners and state prisoners in other jurisdictions, Texas prisoners are not allowed to place a phone call, either collect or prepaid, to a loved one. Unlike federal prisoners and state prisoners in other jurisdictions, Texas prisoners are not allowed to receive a phone call, unless it is a family emergency and, when these calls are approved in advance, the phone is answered with the prison chaplain present.

406. Texas prisoners are not allowed to call or to receive a call from an attorney, unless they can prove that they have a case pending and the phone call is necessary to meet a pending deadline. In federal prisons and state prisons in other jurisdictions, attorney calls are routinely permitted.

407. Texas prisoners are allowed family visits only on the weekend. In federal prisons and state prisons in other jurisdictions, visiting hours occur during the week as well as on weekends.

408. Texas inmates all wear white uniforms. This choice of color is part of a broader plan to keep inmates color starved. This is just another way in which senses are deprived of stimulation, contributing to their isolation.

409. The net effect of blocking phone calls, contacts and stimuli with

the outside world is to shrink the influence of the real world while the world created by these Defendants, a life in prison, grows and engulfs inmates until their perspective is bent and subjugated to the will of their overseers.

410. The collateral attacks upon parole eligibility and suitability are merely another prong for maintaining Defendants' grip upon inmate minds, and superimposing Defendants' world as the only reality fit for inmates.

411. In addition to a prison industrial empire, Defendants operate a diverse and sprawling business empire. Enormous farms are harvesting labor intensive crops. Businesses are rehabilitating a wide array of manufactured items ranging from horse trailers to p.c. circuit boards. There is a boxed beef plant in Amarillo. Braille books are made in Gatesville. This prison business empire is growing. As it grows, it continues to need more and more free labor. Without free inmate labor, these prison industries could not exist.

412. Inmates receive no wages. Working for free has a subtle and eroding impact upon self esteem and it severs another avenue to the outside, the purchase of goods. Lack of money is another prong in the battle to block out the real world and remain fixated upon the world created by Defendants.

413. Through prejudicial overt acts, material omissions, material misrepresentations and acts of deceit and moral turpitude, compounded by guilty knowledge, T.D.C.J. Defendants have methodically and systematically

compromised and impaired every parole avenue out of the T.D.C.J. system.

414. Plaintiffs understand and acknowledge that prison labor and prison industries do not, in isolation, create a cause of action for involuntary servitude. Within reason, and subject to the enviable goal of making prison populations self sufficient, these endeavors are entirely proper.

415. But just as anything in moderation can become harmful when indulged to a point of excess, a line can be crossed. Texas has crossed this line. Defendants are holding tens of thousands of inmates for extended amounts of time, far out of proportion to the wrongs committed. Every technical parole violator held for longer than one year falls into this group. Every inmate serving time beyond their mandatory supervision date due to a finding of new criminal behavior courtesy of Classification constitutes another segment kept beyond their time. Inmates denied their mandatory supervision date because of unchanging factors constitute a third group kept too long. Upon completion of discovery, Plaintiffs may discover additional groups similarly situated to the plights of inmates just described. The purpose for holding these inmates has nothing whatsoever to do with public safety. It is about business, and keeping beds occupied.

416. Defendants are violating the 13th Amendment of the U.S. Constitution by creating an environment that is unnecessarily starving for

contact with the outside world; by systematically and methodically reducing the self esteem of inmates by forcing them to work long hours under an unforgiving Texas sun for no wages; and by systematically and methodically impairing and blocking all parole avenues for getting out of prison. At the same time, Defendants are growing a prison industrial empire and a business empire which require an ever increasing pool of inmates. The net result is that tens of thousands of Texas inmates are being held for protracted periods of time exceeding the penological interests of the State as defined by the Legislature, solely because of an improper economic motive.

417. Involuntary servitude applies because inmates have been separated from reality and subjugated so thoroughly to their overseers' will, their vision of reality is blurred to the point that it is one and the same with a prison regime. Recidivism is rampant because it is their only reality.

## Claim 6 – Bad Faith

418. Paragraphs 1 through 415 are hereby incorporated by reference and inserted into this claim, as if each paragraph was fully printed here.

419. A Bad Faith claim does not raise a federal question. This claim rides piggy-back upon constitutional claims grounded in civil rights violations. Before Bad Faith may be considered, Plaintiffs must first raise a federal constitutional question through a civil rights claim. Once this constitutional

civil rights claim has been resolved on the merits in Plaintiffs' favor, this Courts' pendant jurisdiction enables Bad Faith to become cognizable.

420. A Bad Faith claim is actually directed toward the government's qualified immunity shield. Public officials enjoy protection from litigation as they perform their official duties. Every public official performing duties is imbued with qualified immunity. If a public official violates a clearly established legal or constitutional right, this immunity may be penetrated and the government can be held liable. If the violation of a legal or constitutional right springs from bad judgment, the qualified immunity shield will prevail. If the violation springs from willful misconduct, qualified immunity will yield and the government can be held monetarily liable.

421. The touchstone for determining whether the violation of a legal or constitutional right sprang from bad judgment or from willful misconduct has been defined in case law as follows. Statutory or constitutional rights must be so clearly established when the acts were committed that any officer in the defendant's position would have clearly understood that he was under an affirmative duty to have refrained from such conduct.

422. Bad faith is more than bad judgment or negligence. Bad faith requires a mens rea (i.e. mental intent) importing a dishonest purpose or moral obliquity. This typically translates into the breach of a known duty through

some motive of self interest or ill will. Bad faith differs from the negative idea of negligence in that it contemplates an affirmative state of mind operating with furtive design, driven by a self serving motive.

**(a) Emasculating and Circumventing Government Code § 508.144.**

423. The Legislature ordered the Parole Board to promulgate and apply parole guidelines. Government Code § 508.144 memorializes this mandate. In so doing, every incarcerated class member is entitled to an evaluation for parole pursuant to properly drafted guidelines contemplated by this provision.

424. The Legislature's mandate further requires these Defendants to consider, in the promulgation of these guidelines, recidivism factors and the severity of the current crime. At a meeting of the Texas Parole Board on January 18, 2001, the guidelines promulgated by Security Response Technology were formally adopted and remain the parole guidelines for these Defendants up to the present time. These guidelines have been represented to the Legislature as a full faith, sincere response for complying with § 508.144.

425. In general, guidelines sanitize decision-making by making factors entered into a decision transparent and structured. This is achieved through the adoption of a decision-making model which serves as a framework. Within this framework, any set of conceivable facts can be diagrammed. The decision-making model provides structure and transparency to the entire

decision-making process up to the end result. By consulting guidelines, any applicant should be able to determine roughly how their situation will fare.

426. Along with transparency in decision-making, guidelines also entail restricting a decision-makers exercise of discretion to the confines allotted in the decision-making model. The primary purpose served by guidelines is to purge the decision-making process of mysticism and conjecture. Instead, the process is opened to scrutiny and characterized by transparency and honesty.

427. Government Code § 508.144 was emasculated by Defendants when the present guidelines were adopted. These guidelines begin appropriately, taking recidivism factors and the severity of the crime into account. At the intersection of a matrix grid where the crime and recidivism scores intersect, the answer to a core question – how much time is to be served – should appear. Instead of revealing a guideline range answering this question, the square contains a probability factor. The absence of certainty – the time to be served remains unknown – at this critical junction defeats the purpose to be served, and renders the entire exercise worthless.

428. Through prejudicial overt acts, material omissions, material misrepresentations and acts of deceit and moral turpitude, compounded by guilty knowledge, T.D.C.J. Defendants have promulgated and substituted alternative guidelines, and these alternative guidelines are dictating decision-

making in lieu of these formally adopted guidelines. Government Code §508.144(a)(3) was circumvented by Defendants when implementation was frustrated by the adoption of an alternative set of guidelines.

429. Dishonest purpose can be found in the overt act of adopting these parole guidelines. Outwardly, these parole guidelines appear to be legitimate. A reputable company has been retained to formulate them. The decision-making model resembles the format and structure used in other jurisdictions. Only a person thoroughly acquainted with the use of parole guidelines in other jurisdictions would pick up the fatal flaw they incorporate. Defendants created the appearance of parole guidelines, to camouflage the fact that there are no real parole guidelines. It is dishonest to provide the outward appearance of a decision-making model and measuring instrument, when you know the decision-making model renders no real answers and is, therefore, counterfeit.

430. Evidence of moral turpitude can be drawn from these parole guidelines. Moral turpitude contemplates acts which tend to betray in an evil and dishonorable manner. The Legislature has been lead to believe that the adoption of these guidelines has served the purpose of sanitizing and rendering transparent the decision-making process for parole. In practice, these guidelines facilitate the very evil which guidelines are supposed to be prevent. Under these guidelines, Defendants enjoy a license to exercise unfettered and

unchecked discretion. Mysticism, conjecture, a check to insure that new entrants are not lagging behind the number of parolees, a further check to determine whether the inmate's job in a prison industry can be covered by another inmate, can all enter into the decision to grant a parole. The trust of the Legislature has been betrayed, because these guidelines do not further the purpose of making parole decision-making structured, transparent and honest.

**(b) Converting Government Code § 508.145 (f) into a Vain Act**

431. The Legislature has decreed, via Government Code §508.145(f), that an offender convicted of a crime which has not been singled out for especially severe treatment, should be given serious parole consideration once their good conduct time and calendar time equal one fourth of their sentence.

432. Eligibility statutes for parole and for mandatory supervision are not subjects which should be trivialized or manipulated by clerks at whim. As months turn into years and these dates draw near, the prospect of parole assumes a very real and psychologically critical importance to an inmate. The motivation to maintain good behavior and cope with a prison regime can be garnered from the reasonable expectation that this conduct is appreciated and, when parole eligibility arrives, prison officials will reward them with a release. The mental health of the inmate can literally depend upon the meaningful prospect for parole. Conversely, frustrating the chance to gain one's freedom

can be devastating. This disappointment can be manifested in misdirected anger, regressive behavior, depression and a propensity to become distrustful.

433. The maintenance of a fair and equitable parole program is not just important to inmates. This should also be a matter of equal concern to prison officials, charged with the responsibility of managing large inmate populations and sensitive to the welfare of their prison staff and other prisoners.

434. Through prejudicial overt acts, material omissions, material misrepresentations and acts of deceit and moral turpitude, compounded by guilty knowledge, Defendants have adopted a practice of perfunctorily denying parole to inmates at their initial review, after serving the time stipulated by Government Code §508.145(f). Unless an inmate is fortunate enough to hire a very good parole attorney, the chances of being paroled at this first review are basically nil.

435. Dishonest purpose can be found in the overt acts of circulating a parole file, arranging for an interview with an institutional parole officer, and putting an inmate on notice that they are being considered for parole, when Defendants know before the process begins that this initial review will be denied. Once again, the outward appearance of a parole review serves to camouflage the fact that there is no serious parole consideration taking place.

436. Evidence of moral turpitude can be found in these practices. When

the Legislature enacts a law, every part of the law is deemed to be effective. By creating an opportunity for certain inmates to earn a parole after serving one-fourth of their sentence, the Legislature was obviously sanctioning an early release. It is the role of the Legislature, not these Defendants, to define the State's penological interests. By converting this initial review into a hollow bureaucratic formality, this portion of the statue becomes a vain act.

**(c) Defying and Contravening Article 5, § 5 of the Texas Constitution**

437.  The Texas Constitution stipulates that the judicial power of Texas is vested in the Judiciary, and all criminal matters come under the jurisdiction of the Court of Criminal Appeals, whose determinations are to be final.

438. Since the Criminal Justice Reform Act of the 71st Legislature consolidated parole and correction agencies into the Texas Department of Criminal Justice, the Parole Board's mission has been radically altered.

439. Through prejudicial overt acts, material omissions, material misrepresentations and acts of deceit and moral turpitude, compounded by guilty knowledge, T.D.C.J. Defendants have crippled and disabled the Parole Board's ability to do its job by separating its decision-makers from their central staff, leaving the Parole Board with inadequate resources and personnel to screen the entire base of 164,000 inmates and render decisions on the 78,000 cases requiring attention. .

152

440. Without any legal or constitutional basis for doing so, the statutorily assigned duties of the Parole Board have been effectively delegated to the Classification and Records division of T.D.C.J., where the capability exists to give individual attention to 164,000 files.

441. Evidence of a furtive and surreptitious state of mind can be drawn from the following overt acts connected with the radical altering of the Parole Board from 1993 to the present. Ostensibly, the Parole Board is represented as autonomous and independent of the Texas Department of Criminal Justice. In practice, the Parole Board has a parasitic relationship with its parent. Parole Board Defendants only know what the Classification division chooses to tell it. By controlling the flow of information and the contents of files, Classification is in a position to both orchestrate and dictate parole decision-making. Contrary to this actual practice, these Defendants incongruously represent to inmates and the public at large that 17 parole decision-makers are deciding all of these 78,000 cases. The surreptitious state of mind consists of concealing Classification's powerful agenda setting and decision-making role, while maintaining instead the preposterous, actually absurd picture once the mechanics are fully appreciated, of the Parole Board deciding all these cases.

442. Since Parole Board decision-making has been delegated to the Texas Department of Criminal Justice, acting through its Classification

division, there has been a radical change in the kind of decisions produced. Decisions rendered by trial courts are no longer considered definitive. Defendants have a practice of piecing together a *general offense character* assessment or score. Typically, this *general offense character* incorporates new criminal behavior. Next, this *general offense character* is substituted for the true criminal verdict of a trial court. In this manner, Texas inmates are being prosecuted, found guilty and sentenced for new criminal behavior, without any knowledge of the process until they receive their travel card or they otherwise learn about their *general offense character* profile.

443. This practice of formulating a *general offense character* profile, substituting this *general offense character* profile for the verdict of a trial court and then justifying additional time based upon facts never proven in a court of law or admitted in a plea, defies the authority of the Judiciary. From this point forward, the inmate serves a sentence created by clerks and administrators in Classification, and the trial court's decision is reduced to an advisory opinion. In this manner, Defendants are contravening the Texas Constitution's article 5.

444. Evidence of moral turpitude can be found in the overt act of looking beyond the factual findings of a court judgment and adopting new findings, never sanctioned by a judge, to find an inmate guilty of new criminal behavior. The spectacle of clerks rendering judicial decisions is ignominious.

445.  Evidence of dishonest purpose can be found in these facts. These Defendants are realizing a conviction circuitously, which the State was unable to acquire through a court of law. Without the sanction of a court, all of these pseudo convictions by Classification for new criminal behavior are fraudulent.

**(d) Circumventing and Perverting Government Code § 508.147.**

446. The Legislature has formulated a second kind of parole, called Mandatory Supervision. Government Code § 508.147 stipulates that an inmate is entitled to be released when his good conduct time and his calendar time equal his sentence. The Fifth Circuit and the Court of Criminal Appeals have further ruled that the Parole Board's discretion is restricted, when seeking to block the release of an inmate after qualifying for mandatory supervision.

447.  Government Code § 508.147 requires the Parole Board to justify its decision to block release by affirmatively finding that the inmate's accrued good conduct time is not a true reflection of their potential for rehabilitation, and that their release can pose a danger to the public.

448.  Government Code § 508.147 is being perverted, because the Parole Board has a practice of blocking an inmate's release, relying upon unchanging factors such as the nature of the offense and their prior criminal history. This information, without more, is not responsive to the predictive and subjective judgments which this statute contemplates. At the same time,

Defendants ignore a plethora of evidence which is germane, probative and supports the finding by a preponderance of the evidence that an inmate's good conduct time is deserved, and their release would not pose a danger to the public.

449.  Government Code § 508.147 is being circumvented, because the Classification division of the Texas Department of Criminal Justice has a practice of altering the inmate's criminal judgment, just prior to reaching their date for mandatory supervision, by adding criminal conduct which disqualifies the inmate for consideration by virtue of an unproven crime or enhancement. Inmates are helpless to challenge these findings, because the mandatory supervision statute rules out any administrative and judicial appeal avenues.

450. The Classification division of the Texas Department of Criminal Justice makes a concerted effort to collect negative and highly prejudicial facts about inmates, without any regard for their truth or veracity. At the same time, Classification shows no interest in gathering any positive records and actually refuses some positive records, particularly if they provide irrefutable proof that one of their favorite bad records is false.

451. This selective process of gathering and collecting prejudicial information, while ignoring a plethora of evidence supporting a finding that the inmate is conspicuously eligible for parole, culminates in an incomplete

portrait. Much of the evidence proving that an inmate's good conduct time is deserved, that rehabilitation has occurred and that their release poses no danger to the public, is missing from the file. Furthermore, inmates have no right to see their file and the evidence being used against them.

452. There is evidence of moral turpitude in these facts. The Legislature has demonstrated substantial trust in these Defendants, by giving them the authority to arrive at these two release findings and make definitive judgments with no avenues for appeal. Defendants are abusing this trust by selectively gathering information and methodically building a record that is neither accurate nor honest. Defendants are also accusing inmates of new criminal behavior, never sanctioned by a trial court, which disqualifies the inmate by virtue of their new unproven crime. In short, this grant of trust is being betrayed. Defendants are exploiting and abusing this grant of authority in a manner contrary to the letter and spirit of this code provision.

### (e)  Subverting the Legislature's Parole Suitability Criteria [66]

453. The Government Code, the Texas Administrative Code and the Offender's Handbook all contain provisions which collectively set out the criteria for parole suitability. None of these provisions link parole suitability to the crime or to any other *unchanging factor.*

---

[66] For specific government code, administrative code and offender handbook provisions, see the heading titled *Parole Suitability.*

454. Defendants typically refer to *unchanging factors*, such as the nature of the offense or a prior criminal history, as justification for denying parole. In doing so, Defendants are expressly subverting the parole suitability criteria of the Legislature.

455. These overt acts constitute evidence of moral turpitude. Defendants have no legal or constitutional authority to unilaterally declare statutes and administrative rules inapplicable. Defendants have no legal or constitutional authority to substitute *unchanging factors* to take their place.

456. There is also dishonesty in the overt act of declaring an *unchanging factor* as the basis for denying parole. Resort to *unchanging factors* serves as a crutch which Defendants employ because clerks in Classification are either not capable or not inclined to analyze the suitability criteria promulgated by the Legislature. Given this absence of analysis, there is no factual basis for denying parole. Dishonesty consists of using this all purpose rationale – *nature of the offense* – to conceal the truth, namely that the inmate's institutional record and the suitability criteria have not been evaluated, and there is no basis under the governing laws for denial of parole.

**(f) Subverting the Legislature's Indefinite Sentencing Scheme**

457. The Legislature has promulgated an indefinite sentencing scheme. This sentencing structure creates a maximum sentence and a minimum

sentence. The maximum sentence is issued as a deterrent. The minimum sentence is issued to reward offenders that have addressed their anti-social behavior and conformed to the rules. It is anticipated, under the penological philosophy supporting an indefinite sentencing structure, that each sentence will have equal legitimacy. By their behavior, inmates would gravitate to one or the other. The Parole Board has the task of identifying inmates deserving of parole, and rewarding their efforts with an early release.

458. Since 1993, the mission of the Parole Board has been perverted by the business agenda of its *de facto* parent, the Texas Department of Criminal Justice. Instead of fulfilling its statutory responsibility of reviewing and rewarding well behaved inmates with a parole, the Parole Board has been enlisted to insure that all economies of scale are being realized. The Parole Board's specific role has been to block the release of deserving inmates, the very antithesis of the Parole Board's role as envisioned by the Legislature and as written into the law, to be sure that every bed in the system remains utilized.

459. Proof of this radical revision in the Parole Board's mission can be found by comparing the ratio of paroles granted in the last years when it was truly independent, and since 1993 when the Parole Board became a pawn of the Texas Department of Criminal Justice. In 1990 and 1991, the Parole Board

approved 78.1% and 74.3% of the cases considered.[67] From 1992 forward, the ratio of paroles granted began to decline. By 1995, the number of paroles granted as a percentage of the cases considered had dropped to 21.6%, and it has remained at levels hovering between 17% and 22% ever since.[68]

460. In the process, these Defendants have literally shredded the indefinite sentencing scheme enacted by the Legislature, and replaced it with a new sentencing scheme of their own creation which only recognizes and takes seriously one sentence, the maximum sentence issued by the trial court. As a result, good behavior and rehabilitation are no longer tickets to early release. Indeed, there is no such thing as a ticket for early release. Defendants take good behavior for granted. Rehabilitation is ignored. First time offenders and model inmates alike are receiving *serve all* slips despite exemplary records.

461. This conduct constitutes evidence of moral turpitude. Defendants have no legal or constitutional authority to treat the minimum sentence as if it did not exist. Defendants have no legal or constitutional authority to treat the maximum sentence as if it were the only sentence. Defendants have no legal or constitutional authority to render *good conduct time* worthless when the

---

[67] In 1990, there were 59,911 cases considered and 46,791 approved, or 78.1%. For 1991, 49,856 cases were considered and 37,043 were approved, or 74.2%.

[68] The actual ratio of paroles granted as a percentage of cases considered consisted of 58.1% in 1992, 39.1% in 1993, 29.3% in 1994, 21.6% in 1995, 21.8% in 1996, 17% in 1997 and 20.28% in 1998.

inmate is conforming to rules and actively addressing anti-social behavior.

462. This conduct reflects a dishonest motive. Defendants hold well behaved inmates because they create no problems and will never return. An improper economic motive drives these decisions, not their crime. Dishonestly consists of concealing these economic motives behind an *unchanging factor*.

**(g) Subverting Binding Judicial Decisions**

463. After losing court judgments, Defendants have a practice and a history of refusing to conform and correct their own behavior once it has been declared improper and prohibited.

464. The decision of Ex Parte Thomas Christopher Retzlaff, decided by the Court of Criminal Appeals in 2004 [2004 Tex. Crim. App. LEXIS 378] held that an inmate qualified for mandatory supervision has a vested liberty interest. This vested liberty interest entitles the inmate to a notice at least 30 days prior to the hearing, which must follow in the next month. Despite this ruling, these Defendants still persist in issuing generic notices to candidates for mandatory supervision, which do not provide sufficient time to prepare for a hearing or, alternatively, provide notices so far in advance that any materials prepared become outdated. In short, all of the ills highlighted in this decision continue to persist.

465. Ex Parte Patrick Gene Thompson, decided by the Court of

Criminal Appeals in 2005 [2005 WL 2374565 (Tex. Crim. App.)] held that ineligibility for release on mandatory supervision should be determined by the crime's essential characteristics – referring to Government Code § 508.149(a) – and not its statutory title. Plaintiffs are informed and believe, and therefore allege, that Defendants continue to disqualify class members for mandatory supervision, simply because the title of their past crime matches the title of a current crime listed in Government Code § 508.149(a).

466. Ex Parte Mabry [Petition No. 74,864, decided June 9, 2004] decided by the Texas Court of Criminal Appeals and states that an offender is entitled to the credit for their street time toward discharge of their sentence while on parole, if they have served over half of their remaining sentence on parole and the crime committed is not on the list of crimes declared ineligible for mandatory supervision (Government Code § 508.149(a)]. Plaintiffs are informed and believe, and therefore allege, that Defendants continue to deprive class members of their accrued street time, even though there is less than half of their sentence left to serve, when a new bench warrant is issued.

467. These court decisions are illustrative and not exhaustive. Plaintiffs hereby place Defendants on notice that any decisions issued by the Court of Criminal Appeals, the Fifth Circuit or the United States Supreme Court which are binding upon these Defendants are hereby incorporated by reference as if

fully printed here. Plaintiffs further place Defendants on notice that all such decisions will be monitored and utilized in support of this claim for Bad Faith.

**(h) Operating Totally Outside Democratic and Judicial Processes**

468. Bad Faith and Qualified Immunity focus upon single laws and singe constitutional violations. When all of these enumerated statutes, constitutional sections and judicial decisions are considered collectively, another cause of action representing the cumulative effect of these isolated violations comes into focus. Defendants have effectively staked out an independent fourth branch of government, operating totally outside democratic and judicial processes. Behind prison walls, the labor of inmates is fueling a slavery driven economy, it is reaping slavery driven profits and it is reflecting a slavery mentality.

469. Defendants have propped up the Parole Board as a mini judiciary over the affairs of inmates and parolees. These Defendants control the fates of one out of twenty Texas residents, and they are operating with a calloused disregard for the civil rights of class members subject to their authority.

470. The criteria employed for parole is not even confined to Texas. Use of N.C.I.C. codes, borrowed from the F.B.I., have been imported to define the severity level of a crime. These federal N.C.I.C. codes are 50% of the parole guideline scoring system (i.e. consisting of the severity factor attached to the

current crime) currently adopted by the Parole Board. In effect, this federal nomenclature is overruling and superseding the Texas penal code provision under which an inmate was convicted. This slight of hand constitutes a scheme which effectively separates these Defendants from the Texas judiciary.

471. Defendants have a practice of shopping for highly prejudicial evidence, avoiding and ignoring mitigating factual findings, creating a mosaic of incriminating labels and prompts, called the *general offense character*. There is no precedent or anything even approximating this modus operandi in any of our democratic or judicial traditions. Defendants are superimposing this general offense character profile upon an offender, and using this instead of the trial court conviction, for dictating a sentence. There is no precedent for this conduct in any of our traditions of jurisprudence. In this manner, these Defendants have staked out a terrain, foreign to our system of government.

472. Just the audacity to assume this pedestal of power and exercise this absolute authority, defying the Legislature's and the Judiciary's sphere of authority, constitutes an act of moral turpitude as well as moral obliquity.

## State Issues

## Claim 1 – Good Time and Work Credits

473. Paragraphs 1 through 472 are hereby incorporated by reference and inserted into this claim, as if each paragraph was fully printed here.

474. Through prejudicial overt acts, material omissions, material misrepresentations and acts of deceit and moral turpitude, compounded by guilty knowledge, Defendants have a practice of treating Good Time and Work Credits as discretionary. Time sheets are issued tallying the accumulated Good Time and Work Credits. Without good cause or for no cause at all, Defendants believe they can unilaterally ignore good conduct time – the functional equivalent of erasing these time credits – and do so without feeling any compunction to provide a factual basis for taking this action.

475. Good conduct time serves only one purpose, and this is to shorten the length of the sentence. Defendants' practice of ignoring good conduct time and not applying it to the end of a sentence has the effect of converting good conduct time into a fiction.

476. Plaintiffs understand and acknowledge that the discretionary authority to withhold good conduct time exercised by Defendants has been conferred by the Legislature. [69]

477. Article 4, § 11 (b) of the Texas Constitution reads in pertinent part: "The Legislature shall have authority to enact parole laws and laws that require or permit courts to inform juries about the effect of good conduct time and eligibility for parole or mandatory supervision on the period of incarceration

---

[69] *See* V.T.C.A. Government Code § 508.149(b).

served by a defendant convicted of a criminal offense."

478. For every calendar day served, an inmate also receives credit for one day of good time and a half day of work credit. *Good conduct time* actually means that every calendar day served counts as two and a half days. Stated differently, a ten year sentence will be reduced to four years, or by 60%, after good conduct time is factored into the equation.

479. The impact of good conduct time – shortening the sentence by 60% of the calendar time – is communicated to a jury just before they deliberate and determine the sentence to be served. The conclusion is unavoidable that juries consider the impact of *good conduct time* and factor these credits into their decision-making, causing juries to inflate the sentence deemed appropriate by a factor of two and a half times, to insure that the sentence deserved is served.

480. Under the Texas Constitution, an expectancy of good conduct time has been communicated to juries just prior to sentencing. No doubt, this expectancy is being incorporated into the sentence. Given the size of this factor, it is more than doubling the length of the sentence being issued.

481. If an expectancy of good conduct time can be conferred to juries in this manner, the same expectancy of *good conduct time* must vest as well in the criminal defendant. There cannot be one standard governing good conduct time for the parties charged with responsibility for determining the sentence,

166

namely juries, and a separate and altogether different standard for a criminal defendant who must serve this time. It is not just or fair for a jury to presume good conduct time will shorten the calendar time 60%, causing them to multiply the sentence deemed appropriate by 250%; while representing to the inmate that good conduct time cannot be applied to the end of the sentence, thereby making them serve a sentence that is in all likelihood two and a half times as long as the jury would have required. The same standard must apply to all parties affected. *Good conduct time* cannot be both a reality and a fiction.

482. While the Texas Constitution guarantees that a jury will factor good conduct time into its calculation for time to be served, the Legislature has given these Defendants the discretion to render this same good conduct time worthless. Obviously, these two authorities are on a collision course.

483. To reconcile these conflicting laws, we turn first to the source. The Texas Constitution is the supreme legal document for the State, superseding any individual acts of the Legislature. Its superior authority derives from the fact that every term has been ratified by the voters of the State. Texas voters approved this portion of Article 4, § 11 (b) just quoted.

484. Rights may spring independently from the literal terms of the Texas Constitution, and these rights cannot be altered or changed by legislative acts. If a term in the Texas Constitution is on a collision course with an act of

167

the Legislature, the latter must yield. The same expectancy of good conduct time communicated to a jury is transferred and becomes vested in the criminal defendant. The act of the Legislature authorizing Defendants to render good conduct time worthless is superseded and overruled by the Texas Constitution.

485. There is still further authority for finding that the granting of *good conduct time* is not discretionary and, once vested, must be charged to the fulfillment of the sentence. As this term appears in the Texas Constitution, it is bonded and inseparable from the act of sentencing a criminal defendant. Sentencing criminal defendants is the exclusive province of the Judiciary. While the Legislature has authority to define crimes and criminal punishment, the Legislature's authority stops and the Judiciary's authority commences, once jurisdiction is conferred over a criminal case. Given the timing of this *good conduct time* instruction to a jury, the Judiciary has firmly assumed jurisdiction. A delegation of authority to these Defendants to grant or withhold *good conduct time* after execution of the sentence has commenced amounts to an intrusion into the Judiciary's sphere of authority, and violates the Texas Separation of Powers Doctrine.

486. The authority of these Defendants to exercise any discretion whatsoever over the application of good conduct time credits is an *ultra vires* exercise of authority, even though authorized by the Legislature, for it

contravenes the above quoted provision of the Texas Constitution and it is usurping Judicial authority, violating the Texas Separation of Powers Doctrine.

## Claim Two – Enforcement of Plea Agreements

487. Paragraphs 1 through 486 are hereby incorporated by reference and inserted into this claim, as if each paragraph was fully printed here.

488. In plea agreements, the minimum sentence is the focus of the negotiations. Inmates are persuaded to take a plea, because they anticipate a shorter sentence from the judge and a genuine opportunity to be paroled at their first review.

489. When prosecutors enter into a plea agreement, the State is making a contract with the defendant. Typically, the prosecutor agrees to amend the original indictment or to refrain from asking for the stiffest penalties, doing something the prosecutor is not legally obligated to do. The inmate agrees to waive constitutional rights and spare the State the cost and ordeal of a jury trial. This is something the inmate is not legally obligated to do. When these two promises are exchanged, valid consideration is created and a binding contract has been formed between the inmate and the State.

490. Defendants are administrators connected with the Executive Branch of government, and are bound by the contract made on behalf of the State.

491. When the State entered into its plea agreement, it agreed to be bound by the findings of the trial court. Through prejudicial overt acts, material omissions, material misrepresentations and acts of deceit and moral turpitude, compounded by guilty knowledge, Defendants have a practice of formulating a *general offense character* for every inmate, and this profile trumps the findings of the trial court.

492. In addition, these Defendants are not giving class members serious consideration for release at their first parole review, another violation of this plea agreement.

493. As a result, the State is violating the terms of its plea agreement. Class members seek reinstatement of the findings issued by their trial court, along with a new parole review conducted in strict conformity with the law.

## Claim 3 – Technical Parole Violators

494. Paragraphs 1 through 493 are hereby incorporated by reference and inserted into this claim, as if each paragraph was fully printed here.

495. Defendants have no policy for dealing with technical parole violators, once they have been returned to prison. As a consequence, parole violators are being treated as if they committed a new felony, and they are serving a string set-offs commensurate to a penalty for a felony conviction.

496. Through prejudicial overt acts, material omissions, material

170

misrepresentations and acts of deceit and moral turpitude, compounded by guilty knowledge, Defendants are deliberately treating technical parole violators in this manner because they are helpful in keeping their prisons full and in some cases, they are holding down important jobs in prison industries.

497. The civil rights of these technical parole violators are being violated because they are being required to serve punitive sentence terms, when only a remedial sentence should be required. A remedial prison term is defined as one year or less. Any technical parole violators held for longer than one year are being incarcerated unlawfully, and may be candidates for habeas corpus if this claim is granted.

## Claim 4 – No Meaningful Hearing, Reasoned Parole Decision

498. Paragraphs 1 through 497 are hereby incorporated by reference and inserted into this claim, as if each paragraph was fully printed here.

499. Plaintiffs concede that parole is a privilege, and there is no vested right to be released under the regular parole statute. However, once the prospect of parole is offered, the opportunity must be genuine and it must conform to the statutes and administrative regulations which govern.

500. Defendants have not established a serious framework for evaluating the fitness of a parole candidate. The parole candidate does not receive a hearing attended by the decision-maker. Instead, the interview is

conducted by a clerk, and the decision-maker only reviews a file. The parole candidate has no idea of the evidence being considered against them, and no opportunity to prepare a defense.

501. At the conclusion, parole candidates receive a computer generated form consisting of a series of conjunctive sentences next to codes. Typically, the codes are shorthand for *unchanging factors* such as the nature of the crime and a prior criminal history. There is no reasoned decision and no factual basis offered for denying parole.

502. As a consequence, class members are not receiving serious consideration for parole. The process employed by Defendants is arbitrary and further constitutes a breach of the Parole Board's duty to parole candidates.

503. Parole candidates seek declaratory and injunctive relief entitling them to a meaningful parole hearing, attended by the decision-makers that will decide their fate, concluded with a written decision consisting of a summary of the evidence relied upon and reasons for supporting the end result.

## Claim 5 – No Access to Courts

504. Paragraphs 1 through 503 are hereby incorporated by reference and inserted into this claim, as if each paragraph was fully printed here.

505. Through prejudicial overt acts, material omissions, material misrepresentations and acts of deceit and moral turpitude, compounded by

172

Case 1:05-cv-0100-SS   Document 153   Filed 03/30/00   Page 173 of 182

guilty knowledge, Defendants have a practice of finding new criminal behavior in facts that have already been considered and factored into the sentence by the trial court. These new criminal findings have never been sanctioned by a trial court or admitted by a defendant in a plea. Furthermore, Defendants also have a penchant for relying upon these new criminal findings as justification for blocking a mandatory supervision date.

506. Defendants also have a practice of gathering negative reports while simultaneously ignoring or avoiding positive records. The net result is that the profile of an inmate, as represented by the Classification division, is slanted in a highly prejudicial manner, while lacking a plethora of evidence that is both probative and germane to the question of an inmate's fitness for parole.

507. Class members have no right to appeal to a court of law and challenge errors in a Parole Board decision, or misinformation or even disinformation. A Texas court has no authority to grant a parole. Texas courts are bound by the findings of a Parole Board decision, even if the inmate has proof that these findings are in error.

508. As we have previously noted, there is no functioning Parole Board as contemplated by the Legislature when these parole laws were enacted. The Classification division of the Texas Department of Criminal Justice has absorbed these functions.

509. The only relief that a Texas state court can offer, regarding the denial of a parole, is to examine whether these Defendants have exceeded their authority under the statute or violated the Constitution. Even if a violation of this kind has occurred, the remedy is to remand the matter back to the Parole Board with instructions for granting a new review consistent with the law.

510. Defendants desperately need access to a state court and a neutral and objective decision-maker, to counter a systematic and methodical practice of compromising and impairing their rights to parole and mandatory supervision.

## Claim 6 – Work Credits Exempt from Parole Board Discretion

511. Paragraphs 1 through 510 are hereby incorporated by reference and inserted into this claim, as if each paragraph was fully printed here.

512. On inmate time sheets, Work Credits are tallied on a separate line apart from Good Time. This reflects the fact that Work Credits have a statutory basis that is independent of Good Time.

513. Defendants have a practice of pooling Good Time together with Work Credits and referencing to both as *good conduct time*. When an inmate approaches their mandatory supervision date, Defendants treat Good Time and Work Credits as if they are one and the same. If the Parole Board determines

that an inmate cannot be released at their mandatory supervision date, Work Credits are ignored as if they did not exist.

514. Inmates do not receive wages. In 1988, the Legislature decided that, inmates are to receive another commodity equally as valuable, namely credit toward the completion of their sentence. Since the legislature enacted this statute, inmates have been receiving Work Credits.

515. Work Credits are grounded in contract law. In lieu of wages, inmates receive time for the work they perform. Once earned, just as the labor performed cannot be reversed, neither can the work credit be ignored. Inmates are entitled to have their Work Credits applied to the end of their sentence, reducing the remaining amount of time to be served by their amount.

516. Plaintiffs maintain that Good Time and Work Credits cannot be divested by Defendants, even though authorized to do so by the Legislature [Plaintiffs State Claim 1]. In the event that the Court disagrees and finds that the Legislature has this authority, Plaintiffs submit that Work Credits must be applied to reduce the amount of time to be served, even assuming, for discussion purposes only, that the inmate's release for mandatory supervision can be legitimately blocked. Only Good Time can be ignored. Accrued Work Credits will still apply. When these credits equal the remaining time to be

served, their application effectively sets up a mandatory release date, identical to the mandatory release date which existed under the 65th Legislature.

517. Class members seek a declaratory judgment, finding Work Credits vest when earned and are exempt Parole Board discretion.

## Claim 7 – Arbitrary and Capricious Decision-Making

518. Paragraphs 1 through 517 are hereby incorporated by reference and inserted into this claim, as if each paragraph was fully printed here.

519. The term *Arbitrary* has been defined to mean in an unreasonable manner, without adequate determining principle and without fair, solid and substantial cause. This term has also been construed to mean decision-making which is not governed by fixed rules. The term *Capricious* is defined as a willful and deliberate disregard of competent testimony and relevant evidence.

520. Through prejudicial overt acts, material omissions, material misrepresentations and acts of deceit and moral turpitude, compounded by guilty knowledge, Defendants have a practice of rendering decisions relating to parole in an unreasonable manner, without adequate determining principle, and without fair and substantial cause to support their conclusion. Defendants are both disregarding relevant evidence and embracing erroneous evidence to support decisions.

521. Through prejudicial overt acts, material omissions, material

176

misrepresentations and acts of deceit and moral turpitude, compounded by guilty knowledge, Defendants have a practice of rendering decisions without disclosing eligibility criteria, the application of guidelines or the evidence relied upon. In so doing, Defendants are deviating from fixed rules and rendering decisions predicated upon unknown rules. This practice also constitutes arbitrary and capricious decision-making.

522. As a result of these practices, class members are being denied serious consideration for parole. The parole eligibility term in their prison sentence is being arbitrarily abrogated.

523. Plaintiffs demand a jury trial.

## Prayer for Relief

## § 1983 Remedies - Declaratory and Injunctive Relief

WHEREFORE, in addition to the remedies previously requested under causes of action, Plaintiffs further request the following relief Claims one through five, hereafter referenced as U.S. Constitutional claims.

1. Declaratory relief stipulating that these Defendants are violating the Separation of Powers Doctrine under both the U.S. and Texas Constitutions, that these Defendants are violating the Ex Post Facto Clause and the Double Jeopardy Clause of the U.S. Constitution, that these Defendants are violating the Due Process Clause of both the U.S. and Texas Constitutions, and that

these Defendants are violating the Involuntary Servitude prohibition of the 13th Amendment to the U.S. Constitution.

2. Declaratory relief stipulating that good conduct time, once earned and recorded in a class member's time account, cannot be arbitrarily and unilaterally ignored and rendered worthless, but must be credited toward the end of the sentence. Further declaratory relief ordering Defendants to promulgate new parole hearing procedures, which give every parole candidate an opportunity to be heard by a parole decision-maker, and afford serious release consideration pursuant to the parole suitability statutes, administrative rules and the rules set forth in the Offender's Handbook.

3. Issue a Declaratory Judgment and order Injunctive Relief, requiring that the Parole Board be returned to its full independent status, with its own complement of staff sufficient in size and resources to give individualized attention to all parole candidates, and terminating the role performed by the Classification division.

4. Issue a Declaratory Judgment and order Injunctive Relief requiring that the Parole Board commence new parole hearings in conformity with the Government Code and Texas Administrative Code provisions pertinent to parole, and to cease and desist from relying upon unchanging factors for the formulation of its inherently predictive decision-making.

178

5. Issue a Declaratory Judgment and order Injunctive Relief requiring that the Parole Board promulgate new parole guidelines, which properly delineate guideline ranges linked to specific crimes and restrict the exercise of parole decision-makers to narrowly delineated areas, such as the placement of an offender near the beginning, middle or end of a specific guideline range which matches their conviction, but not to a new guideline range matching any other conviction.

6. Issue a Declaratory Judgment and order Injunctive Relief requiring that Defendants promulgate new guideline ranges specifically tailored to the predicament of Technical Parole violators, with all of these timeframes being remedial in nature, and as quickly as possible, releasing all technical parole violators that have served in excess of this time.

7. Issue a Declaratory Judgment and order Injunctive Relief requiring the formulation of new hearing procedures for mandatory supervision candidates, which are predicated upon the premise that the inmate enjoys a presumption favoring release and this presumption must be overcome by the Parole Board. Because mandatory supervision candidates have a liberty interest, hearing procedures should be ordered to conform to Wolff v. McDonnell, 418 U.S. 539 (1974).

8. Issue a Declaratory Judgment and order Injunctive Relief requiring

179

judicial review for parole violators and parole candidates.

9. Certify this as a class action.

10. Appoint a Master to supervise Parole Board activities, to assist in fashioning remedies and to monitor the implementation of these remedies.

11. Counsel for Plaintiffs seeks reimbursement of full attorney fees pursuant to federal law for all claims cognizable under 42 U.S.C. §1983. Counsel for Plaintiffs further seeks reimbursement for attorney fees pursuant to the body of law regarding private attorney general actions, questions where there is evidence of malice, bad faith, reckless disregard for the welfare of Plaintiffs, evidence of palpable and notorious wrongdoing, abuse of discretion, pursuant to tort law and for any other matters which may be duly qualified for attorney reimbursement.

## Bad Faith Remedies – Monetary Damages

WHEREUPON, subject to and dependent upon a ruling in Plaintiffs' favor upon one of the U.S. Constitutional claims presented pursuant to § 1983, Plaintiffs further the following monetary damages for Bad Faith.

12. Issue a Declaratory Judgment and order Injunctive Relief requiring Plaintiffs to reimburse every class member that has been wrongfully incarcerated in accord with V.T.C.A. Civil Practice and Remedies § 103.001. Said relief is to include the sum of $25,000 for every year of wrongful

180

incarceration, plus lost wages for every year of wrongful incarceration and any further relief afforded by this statute. For any fraction of a year, the penalties shall be assessed pro rata for the portion of the year engaged. Pursuant to the Class Action Fairness Act, these awards may be aggregated for purposes of securing the necessary amount for vesting diversity jurisdiction.

13. Assess a fine amounting to several hundred million dollars with the exact amount to be determined at trial or based upon the evidence tendered, for openly defying the Legislature's and Judiciary's authority, with the proceeds converted to a common fund and distributed for the benefit of victims.

## Part II - Habeas Corpus Remedies

14. Subject to and dependent upon Plaintiffs receiving a favorable ruling on one or more of our U.S. Constitutional claims, Separation of Powers, Double Jeopardy, Ex Post Facto, Due Process and Involuntary Servitude, Plaintiffs hereby place Defendants on notice that, pursuant to the principles of pendant jurisdiction, Plaintiffs are engaging this Court's jurisdiction to adjudicate a second class action, this one involving a Petition for Habeas Corpus. In this Petition for Habeas Corpus, the declaratory judgment secured under § 1983 will be utilized to make out a claim for qualified class members eligible for habeas corpus relief. Under these facts, § 1983 remedies and Habeas Corpus remedies form part of the same case or controversy.

Respectfully submitted

Norman L. Sirak
Ohio Reg. # 0038058
D.C. # 162669
75 Public Square – Suite 800
Cleveland, Ohio 44113
Phone (216) 781 – 2550
Fax (216) 781 – 6688
Email nsirak@parolereform.com